**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

ORIGINAL
FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

OCT 13 2010

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

MARK DANIEL LYTTLE,

    Plaintiff,

v.

The UNITED STATES OF AMERICA; ERIC
H. HOLDER, JR., U.S. Attorney General;
JANET NAPOLITANO, Secretary, Department
of Homeland Security; THOMAS G. SNOW,
Director of the Executive Office of Immigration
Review; JOHN T. MORTON, Director, U.S.
Immigration and Customs Enforcement;
JAMES T. HAYES, Director, Office of
Detention and Removal, Immigration and
Customs Enforcement; RAYMOND SIMONSE,
Field Office Director, U.S. Immigration and
Customs Enforcement; DAVID COLLADO,
Enforcement Officer, U.S. Immigration and
Customs Enforcement; MARCO
MONDRAGON, Enforcement Officer, U.S.
Immigration and Customs Enforcement;
TRACY MOTEN, Enforcement Officer, U.S.
Immigration and Customs Enforcement;
MICHAEL MOORE, Enforcement Officer, U.S.
Immigration and Customs Enforcement;
CHARLES JOHNSTON, Enforcement Officer,
U.S. Immigration and Customs Enforcement;
BRIAN KEYS, Enforcement Officer, U.S.
Immigration and Customs Enforcement; ICE
DOES 1-10, Immigration and Customs
Enforcement Officials and Agents; U.S.
PUBLIC HEALTH SERVICE DOES 1-10;
CORRECTIONS CORPORATION OF
AMERICA; and GEORGIA DOES 1-10,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO.**

**1 10-CV-3302**

**COMPLAINT FOR
VIOLATIONS OF THE
FOURTH, FIFTH AND
FOURTEENTH AMENDMENTS
TO THE UNITED STATES
CONSTITUTION (*BIVENS V.
SIX UNKNOWN NAMED
AGENTS OF FEDERAL
BUREAU OF NARCOTICS*, 42
U.S.C. § 1983); SECTION 504,
REHABILITATION ACT OF
1973; FALSE IMPRISONMENT;
NEGLIGENCE; INTENTIONAL
INFLICTION OF EMOTIONAL
DISTRESS**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1.      This civil rights action seeks injunctive relief and compensatory and punitive damages as a result of the wrongful and illegal detention and deportation of Plaintiff Mark Daniel Lyttle, a 33-year-old United States citizen with mental disabilities born and raised in Rowan County, North Carolina.  Without any basis for believing Mr. Lyttle was not a U.S. citizen, and indeed, with ample evidence that Mr. Lyttle was a U.S. citizen, officials from the North Carolina Department of Correction referred him to ICE as a Mexican national unlawfully in the United States, despite the fact that Mr. Lyttle had never been to Mexico, shared no Mexican heritage, spoke no Spanish, and did not claim to be from Mexico.

2.      Between October 28, 2008 and December 18, 2008, immigration officials and agents of the Atlanta, Georgia District of the United States Immigration and Customs Enforcement ("ICE") Division, under the United States Department of Homeland Security ("DHS"), unlawfully detained Mr. Lyttle at the Stewart Detention Center in Lumpkin, Georgia. During two separate interrogations at which the questioning officer was aware that Mr. Lyttle had mental disabilities, ICE dismissed and failed to investigate Mr. Lyttle's repeated claims that he was a U.S. citizen. ICE ultimately removed Mr. Lyttle to Reynosa, Mexico after an administrative removal hearing in which he received no legal assistance.

3.      Mr. Lyttle's illegal detention and deportation are the direct and foreseeable consequence of official policies, patterns, practices, and customs that manifest not only intentional discrimination based on race and ethnicity and a failure to recognize basic principles of due process, but also a reckless disregard for human life and liberty. Although the U.S. government has long been aware that its failure to implement due process protections in its immigration detention and removal procedures results in unjust detention, unfair hearings and illegal deportations, neither the Department of Justice nor the Department of Homeland Security, Immigration and Customs Enforcement have rectified the shortcomings in their procedures and policies, leaving U.S. citizens like Mr. Lyttle vulnerable to erroneous apprehension, detention and deportation.

4.      The United States government lacks the authority to deport one of its citizens. The Constitution vests certain rights in every individual born within our national borders, among these the right to live in this country. It is the obligation of the government, both at the state and federal level, to protect the liberty and security of its citizens. In this case, the government failed to protect Mr. Lyttle, and individuals who lacked the proper training and oversight violated Mr. Lyttle's constitutional rights, causing Mr. Lyttle profound physical and psychological injuries.

## JURISDICTION AND VENUE

5.      This civil rights action is brought pursuant to, *inter alia*, the First,

Fourth, Fifth and Fourteenth Amendments to the United States Constitution, 42

U.S.C. § 1983, the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.*

and at law for relief from commission of tortious acts.  This Court has jurisdiction

over federal claims pursuant to the constitutional provisions enumerated and 28

U.S.C. § 1331 and § 1343 (3) and (4), as they are brought to redress deprivations

of rights privileges and immunities secured by the United States Constitution and

by law.  Jurisdiction is also proper pursuant to the Declaratory Judgment Act, 28

U.S.C. §§ 2201(a) and 2202.  This Court has jurisdiction over the supplemental

state claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in the Northern District of Georgia, under 28 U.S.C. §

1391(b), in that Defendants are located in this state and district, and a substantial

part of the acts and/or omissions giving rise to Plaintiff's claim occurred in this

district.

## PARTIES

### *Plaintiff Mark Daniel Lyttle*

7.      Mr. Lyttle is a 33-year-old United States citizen of Puerto Rican

descent born on August 2, 1977 in Rowan County, North Carolina.  At age 7, Mr.

Lyttle was removed from an abusive environment, placed in foster care, and

ultimately adopted by Thomas E. Lyttle and Jeanne T. Lyttle.  Mr. Lyttle has

significant mental disabilities and has spent much of his time since adolescence in

psychiatric hospitals. In late 2008, Mr. Lyttle was unlawfully detained by ICE and

subsequently deported to Mexico, whereafter he endured over 4 months living on

the streets and in the shelters and prisons of Mexico, Honduras, Nicaragua and

Guatemala. Mr. Lyttle speaks no Spanish, and until he was wrongfully deported,

had never traveled outside the United States.

### The United States of America and the ICE, EOIR and DOJ Defendants

8.    Defendant United States of America is sued under the Federal Tort

Claims Act for the wrongful and tortious acts of its employees and agencies. The

United States is implicated by and through the actions, policies, patterns, practices,

and customs of DHS and/or ICE and its policy-makers, agents, and officers.

9.    Defendant Eric H. Holder, Jr. is the Attorney General of the United

States and the head of the U.S. Department of Justice (the "DOJ"). Mr. Holder

shares responsibility for implementation and enforcement of the immigration laws

along with Defendant Janet Napolitano. Mr. Holder is sued in his official capacity.

10.    Defendant Thomas G. Snow is the Acting Director for the Executive

Office for Immigration Review ("EOIR"), which is the federal agency that runs the

Immigration Courts. Mr. Snow is responsible for the supervision of the Deputy

Director, the Chairman of the Board of Immigration Appeals ("BIA"), the Chief

Immigration Judge, the Chief Administrative Hearing Officer, and all agency

personnel in the execution of their duties. Mr. Snow is sued in his official capacity.

11.     Defendant Janet Napolitano is the Secretary of Homeland Security and the highest-ranking member of DHS, the arm of the U.S. Government responsible for enforcement of the immigration laws. Ms. Napolitano is sued in her official capacity.

12.     Defendant John T. Morton is the Director of ICE, the arm of DHS charged with detaining and removing aliens pursuant to federal immigration law. Mr. Morton is sued in his official capacity.

13.     Defendant James T. Hayes, Jr. at all times mentioned herein was the Director of the Office of Detention and Removal Operations, which is the primary enforcement arm within ICE for the identification, apprehension and removal of noncitizens unlawfully in the United States. Mr. Hayes is the author of a memorandum to all Field Office Directors within ICE, issued November 6, 2008, which sets forth certain guidelines and directives bearing on the treatment of detainees making claims to U.S. citizenship. Hayes is sued in his supervisory and individual capacity.

14.     Defendant Raymond Simonse at all times mentioned herein was the Field Office Director for the Atlanta Field Office of ICE, which is the Field Office

responsible for the enforcement of the immigration laws within States of North Carolina and Georgia. Simonse is sued in his supervisory and individual capacity.

15.     Defendant David Collado is or was at all times mentioned herein an Immigration Enforcement Agent with ICE. Collado is sued in his individual capacity.

16.     Defendant Marco Mondragon is or was at all times mentioned herein an Immigration Enforcement Agent with ICE. Mondragon is sued in his individual capacity.

17.     Defendant Tracy Moten is or was at all times mentioned herein an Immigration Enforcement Agent with ICE. Moten is sued in her individual capacity.

18.     Defendant Michael Moore is or was at all times mentioned herein an Immigration Enforcement Agent with ICE. Moore is sued in his individual capacity.

19.     Defendant Charles Johnston is or was at all times mentioned herein an Immigration Enforcement Agent with ICE. Johnston is sued in his individual capacity.

20.     Defendant Brian Keys is or was at all times mentioned herein an Immigration Enforcement Agent with ICE. Keys is sued in his individual capacity.

21.    In addition to the foregoing ICE agents and officials, unknown named ICE agents and officials are sued herein in their individual capacities under fictitious names as "ICE Does 1-10" because their true names, titles, capacities, and/or degree of responsibility for the acts alleged herein are unknown to Plaintiff at this time.  When Plaintiff ascertains this information, he will amend this Complaint accordingly.  ICE Does 1-10 include, but are not limited to, ICE Officials and Supervisors, ICE Officers, and/or Immigration Enforcement Agents with ICE (collectively, the "ICE Doe Defendants").  Plaintiff is informed and believes, and thereon alleges, that the ICE Doe Defendants are legally liable to Plaintiff in some part for the wrongful acts and omissions of which Plaintiff complains herein.

22.    Defendants Hayes, Simonse, Collado, Mondragon, Moten, Moore, Johnston, Keys and ICE Does 1-10 are hereafter collectively referred to as the "ICE Defendants."

### *PHS and CCA Defendants*

23.    In addition to the foregoing federal agents and officials, unknown named officials and medical health care providers with the United States Public Health Service ("PHS") are sued herein in their individual and official capacities under fictitious names as "PHS Does 1-10" because their true names, titles, capacities, and/or degree of responsibility for the acts alleged herein are unknown

to Plaintiff at this time. When Plaintiff ascertains this information, he will amend this Complaint accordingly.

24.     Defendant Corrections Corporation of America ("CCA") is a Maryland corporation with its principal place of business in Nashville, Tennessee that is registered with the Secretary of State to do business in the State of Georgia.

25.     In addition to CCA, unknown named employees of CCA, employees and officials employed by or affiliated with Stewart County, and other unknown named agents and officials residing in the State of Georgia are sued herein in their individual capacities under fictitious names as "Georgia Does 1-10" because their true names, capacities, and/or degree of responsibility for the acts alleged herein are unknown to Plaintiff at this time. When Plaintiff ascertains this information, he will amend this Complaint accordingly. Georgia Does 1-10 include, but are not limited to employees of CCA and/or other individuals charged with the care and custody of detainees at SDC (collectively, the "Georgia Doe Defendants"). Plaintiff is informed and believes, and thereon alleges, that the Georgia Doe Defendants are legally liable to Plaintiff in some part for the wrongful acts and omissions of which Plaintiff complains herein.

26.     All of the Defendants acted under the color of law, in bad faith, and contrary to established law and principles of constitutional and statutory law.

27.     Plaintiff is informed and believes and thereon alleges that each of the Defendants caused, and is liable for the unconstitutional and unlawful conduct and resulting injuries, by, among other things, personally participating in said conduct or acting jointly with others who did so; by authorizing, acquiescing or setting in motion policies, plans or actions that led to the unlawful conduct; by failing or refusing with deliberate indifference to maintain adequate supervision; and/or by ratifying the unlawful conduct taken by employees under their direction and control. Defendants' actions were taken pursuant to a policy, custom or usage of ICE and/or the Inter-governmental Services Agreement ("IGSA") between ICE and Stewart County, Georgia.

## FACTUAL ALLEGATIONS

### *Mark Lyttle's Background*

28.     Mark Daniel Lyttle was born in Salisbury, North Carolina on August 2, 1977. [See Exhibit A, attached hereto (Birth Certificate of Mr. Lyttle).] Mr. Lyttle spent the first 7 years of his life in an abusive foster home environment before he was adopted by Tom and Jeanne Lyttle on October 31, 1985. [See Exhibit B, attached hereto (adoption records).]

29.     Tom and Jeanne Lyttle initially raised Mark Lyttle in Rowan County, North Carolina along with Mr. Lyttle's three adopted siblings, later moving to and living briefly in Florida and Virginia before settling again in North Carolina.

30.    Mr. Lyttle attended elementary school, but his mental and cognitive disorders led to multiple and frequent commitments at various psychiatric hospitals.  As a result of Mr. Lyttle's near constant institutionalization during his teenage years, Mr. Lyttle did not receive the benefit of a high school education.

31.    As a result of his limited education and significant cognitive problems, Mr. Lyttle's reading comprehension and writing skills are severely limited.  Mr. Lyttle speaks no Spanish or any other second language.  Mr. Lyttle is barely literate and continues to struggle with basic reading and writing, visual processing, conceptualization skills, and memory.

32.    Mr. Lyttle's significant cognitive impairment has contributed to a diminished capacity to comprehend everyday events.  Mr. Lyttle has repeatedly been diagnosed with bi-polar disorder.  He has been taking medication to regulate his bi-polar disorder and control the seizures connected to his chemical imbalance since he was an adolescent.

33.    During his teenage years, Mr. Lyttle became unable to obtain gainful employment due to the limitations of his cognitive and psychological disorders.

34.    In the summer of 2008, Mr. Lyttle was a patient of Cherry Hospital in Goldsboro, North Carolina – a psychiatric hospital operated by the State of North Carolina, Department of Health and Human Services.

### *Mark Lyttle's Arrest and Detention in North Carolina*

35.     While a patient at Cherry Hospital for psychiatric treatment, Mr. Lyttle was charged with inappropriately touching a female orderly.  In 2008, Mr. Lyttle was arrested on the charge of misdemeanor assault on a female under N.C. Gen. Stat. § 14-33.  On or about August 14, 2008, Mr. Lyttle was sentenced to spend 100 days at Neuse Correctional Institution ("NCI").

36.     On or about August 22, 2008, Mr. Lyttle was booked into NCI to begin serving his sentence for the misdemeanor crime.  Due to Mr. Lyttle's obvious cognitive disorder, Mr. Lyttle was housed in NCI's mental health ward.

37.     On or about September 2, 2008, while in the custody of the North Carolina Department of Corrections ("DOC"), Mr. Lyttle was "apprehended" by ICE Agent Robert Kendall and thereafter interrogated by ICE Agent D. Faucette. At the time of the interrogation, Agent Faucette was aware that Mr. Lyttle was cognitively impaired and that he had, among other things, bipolar disorder.

38.     Agent Faucette's handwritten notes indicate that Mr. Lyttle's name was assumed to be "Jose Thomas" and that Mr. Lyttle's true name, Mark Daniel Lyttle, was assumed to be an alias.  Agent Faucette's notes also erroneously stated that Mr. Lyttle's country of citizenship was "Mexico."

39.     Agent Faucette's handwritten entries state that Mr. Lyttle's home address was 100 Timberman Drive [*sic.*], Elizabeth City, N.C., 27909, which is the

address for an assisted living facility named Heritage Care, which caters to the elderly and individuals with mental and cognitive handicaps.

40.     Agent Faucette's notes also state erroneously that Mr. Lyttle entered the United States without permission at age 3.

41.     Agent Faucette failed and refused to have a witness present at the interrogation of Mr. Lyttle; thus, the signature block for the witness who should have been present during Mr. Lyttle's interrogation on September 2, 2008 was left blank on the "Record of Sworn Statement in Affidavit Form."

42.     When Agent Faucette's interview was concluded, Mr. Lyttle was not offered an opportunity to review the contents of the entries written on the form prepared by Agent Faucette, nor was Mr. Lyttle informed of what Agent Faucette had written. Instead, Mr. Lyttle was simply instructed to sign his name on a certain line. Despite Agent Faucette's unfounded and erroneous assumption that Mr. Lyttle's name was "Jose Thomas," Mr. Lyttle signed his true name, "Mark Lyttle."

43.     Another handwritten form filled out by Agent Faucette on or about September 2, 2008 notes that Mr. Lyttle's mother, "Jennie [sic.] Lyttle" was from Kentucky. The same form contains a block labeled, "Narrative: Include details not shown above and whether or not eligible for special status program," in which Agent Faucette wrote the words "Mental Illness" and "Bipolar."

44.    On or about September 4, 2008, Agent Faucette or an ICE agent

acting on Agent Faucette's behalf or at her direction, performed a search of the

United States Department of Justice Federal Bureau of Investigation Criminal

Justice Information Services Division (the "CJISD") and other databases.

Numerous records produced as a result of these computerized database searches

revealed that Mr. Lyttle was a U.S. citizen with a valid Social Security number.

Nowhere in the records produced as a result of the CJISD database search was

there any mention of "Jose Thomas" or of Mr. Lyttle ever having used or been

known by that name previously.

45.    The following day, on or about September 5, 2008, Agent Faucette,

ICE Agents Dean Caputo, Robert Kendall and/or other individual ICE agents

performed computer database searches based on Mr. Lyttle's criminal history.

These searches also produced numerous entries and notations indicating that Mr.

Lyttle was a U.S. citizen with a valid Social Security number.  While noting

several minor variants of the name "Mark Lyttle" having been used, none of these

entries made any mention of the name "Jose Thomas."

46.    Disregarding the overwhelming record evidence of Mr. Lyttle's U.S.

citizenship, as well as his significant mental disabilities, on or about September 5,

2008, Agent Caputo signed a "Warrant for Arrest of Alien" authorizing any officer

delegated authority pursuant to Section 287 of the Immigration and Nationality Act

to take Mr. Lyttle into custody so that he might be processed for removal as "an alien in the country in violation of the immigration laws."

47.    Also on or about September 5, 2008, Agent Caputo signed a "Notice of Intent to Issue Final Administrative Removal Order" in order to commence "removal proceedings under section 238(b) of the Immigration and Nationality Act." According to the Notice of Intent to Issue Final Administrative Removal Order, it had already been determined that Mr. Lyttle was "not a citizen or national of the United States" but rather "a native of Mexico and a citizen of Mexico" who was "deportable under section 237(a)(2)(A)(iii) of the Act, 8 U.S.C. 1227(a)(2)(A)(iii) . . . because [he had] been convicted of an aggravated felony."

48.    On or about this same day, Agent Caputo also signed a Notice of Custody Determination stating that Mr. Lyttle "shall be detained in the custody of the Department of Homeland Security" pending a final determination by the immigration judge assigned to Mr. Lyttle's case. Agent Caputo further noted on the Notice of Custody Determination that "[Mr. Lyttle] may not request a review of this determination by an immigration judge because the Immigration and Nationality Act prohibits [Mr. Lyttle's] release from custody."

49.    Also on September 5, 2008, Agent Kendall signed a Form I-247 Immigration Detainer, notifying North Carolina DOC that Mr. Lyttle was not to be

released from their custody upon completion of his criminal sentence because ICE had determined that Mr. Lyttle was of Mexican nationality and deportable.

50.    Three days later, on September 8, 2008, Agent Faucette personally served copies of the Notice of Intent to Issue Final Administrative Removal Order and Warrant for Arrest of Alien on Mr. Lyttle at 12:05 p.m. and 12:10 p.m., respectively.  Agent Faucette signed a portion of the Certificate of Service for the Notice of Intent stating that she served the Notice on Mr. Lyttle personally, and likewise executed a Certificate of Service for the Warrant for Arrest of Alien indicating personal service on Mr. Lyttle.

51.    Disregarding Mr. Lyttle's mental disabilities and the substantial record evidence of his U.S. citizenship, Agent Faucette coerced and manipulated Mr. Lyttle into signing a statement admitting the allegations in the Notice of Intent to Issue Final Administrative Removal Order, thereby waiving his legal rights to a removal hearing before an immigration judge.  By signing the waiver, Mr. Lyttle falsely acknowledged that he was a citizen of Mexico and that he agreed to be voluntarily deported to Mexico, despite the fact that Mr. Lyttle was and is a United States citizen.  Mr. Lyttle did not understand what he was signing or that he unknowingly consented to being deported to Mexico.  Despite his serious and acknowledged mental disabilities, Mr. Lyttle received no assistance from ICE

- 16 -

agents -- or anyone else -- in attempting to read or understand the form that he was coerced and manipulated into signing.

52.    Also on September 8, 2008, Agent Faucette coerced Mr. Lyttle, whom she knew to have cognitive disabilities and bipolar disorder, into signing an acknowledgment of the "Notice of Custody Determination" issued by agent Caputo on September 5, 2008.

53.    Even though the form Mr. Lyttle signed stated that his name was "Jose Thomas," Mr. Lyttle signed his real name: "Mark Lyttle."

54.    No reasonable basis existed to suspect or otherwise conclude that Mr. Lyttle was not a United States citizen.  In fact, the records available to the ICE agents in North Carolina contained numerous references to Mr. Lyttle being an American citizen by birth and to his social security number, both of which could have easily been verified by contacting the Social Security Administration.

### Mr. Lyttle Was Transported To Stewart Detention Center To Await Removal

55.    Mr. Lyttle spent just over a month at NCI before being transferred to New Hanover Correctional Center ("NHCC") on or about September 23, 2008. Mr. Lyttle spent approximately one week at the NHCC before being transferred again to Greene Correctional Institution ("GCI"), where he would serve the remainder of his term in the custody of the North Carolina DOC.

56.    Mr. Lyttle had been scheduled to be released from GCI on or before October 26, 2008. Instead, on or about October 28, 2008, Mr. Lyttle's detention was continued, and he was delivered into ICE custody for transport to the Stewart Detention Center ("SDC") in Lumpkin, Georgia.

57.    SDC is a detention center operated by ICE Detention & Removal Operations ("DRO") and CCA pursuant to an IGSA with Stewart County, Georgia, with whom ICE works to administer the SDC.   ICE and Stewart County have contracted with CCA to provide staffing and personnel to house individuals who are waiting for their immigration status to be determined or who are awaiting repatriation.

58.    On or about November 3, 2008, Mr. Lyttle was interrogated by ICE Defendant David Collado.  Defendant Collado recorded Mr. Lyttle's sworn responses to the questions on the "Record of Sworn Statement in Affidavit Form." In that interrogation, Mr. Lyttle stated unequivocally that he was a United States citizen, born on "08/02/1977 [in] Rowann [sic.] County NC," and repeatedly denied being a Mexican citizen.

59.    An un-served Notice of Intent to Issue Final Administrative Removal Order accompanied Defendant Collado's interrogation form of Mr. Lyttle. Defendant Collado's Notice accurately reflected that Mr. Lyttle was "a native of United States and a citizen of United States," but Defendant Collado nonetheless

proceeded to charge that Mr. Lyttle was deportable from the United States on account of his criminal convictions.

60. Two days later, Defendant Collado filled out an I-213 "Record of Deportable/Inadmissible Alien" dated November 5, 2008, recounting the history of Mr. Lyttle's apprehension by ICE in North Carolina and noting that Mr. Lyttle had "a bipolar mental illness condition." Mr. Lyttle was never presented with a copy of this I-213, nor afforded an opportunity to review its contents or have the entries in the form read to him.

61. In light of Mr. Lyttle's sworn statement of United States citizenship, Defendant Collado indicated that Mr. Lyttle should not be subject to "administrative removal" proceedings – in which there is no hearing before an immigration judge – but instead should be referred for an immigration judge removal hearing.

62. On or about November 5, 2008, ICE Defendant Tracy Moten issued Mr. Lyttle a formal Notice to Appear ("NTA") at removal proceedings before an immigration judge. Despite Mr. Lyttle's assertion of U.S. citizenship, and the lack of any independent evidence supporting the charge that Mr. Lyttle was a Mexican citizen, the NTA alleged that Mr. Lyttle was "not a citizen or national of the United States" but rather "a native of Mexico and a citizen of Mexico [who] arrived in the United States at or near UNKNOWN PLACE, on or about 1980."

### *The Hayes Memo*

63.     Around this same time, on November 6, 2008, Defendant James T.

Hayes, then Director of DRO, issued a memorandum to all ICE Field Office

Directors, the subject line of which read, "Superseding Guidance on Reporting and

Investigating Claims to United States Citizenship" (the "Hayes Memo").

According to the Hayes Memo, its purpose was to address ongoing problems and

deficiencies within ICE in its agents' handling affirmative claims to U.S.

citizenship.

64.     This new guidance was published after congressional hearings and

significant media attention to the detention and deportation of U.S. citizens. Ian

James, *Wrongly Deported, American Citizen Sues INS for $8 Million*, L.A.

TIMES, Sept. 3, 2000.  Paloma Esquivel, *Suit filed over man's deportation ordeal,*

L.A. TIMES, Feb. 28, 2008; Sandra Hernandez, *Deported U.S. Citizen Sues U.S.,*

DAILY JOURNAL, Feb. 27, 2008; Emily Bazar, *Citizens sue after detentions,*

*immigration raids*, U.S.A. TODAY, June 26, 2008;  Anna Gorman, *U.S. citizen was held*

*in immigration custody,* L.A. TIMES, Oct. 28, 2008; The Expedited Removal Study:

Report on the First Three Years of Implementation of Expedited Removal, 15

Notre Dame J.L. Ethics & Pub. Pol'y 1, 83-84 (2001).

65.     On February 13, 2008, the U.S. House of Representatives Judiciary

Committee sponsored a hearing on shortcomings in ICE procedures in

interrogation, detention, and removal leading to the detention and deportation of U.S. citizens. Professor Rachel E. Rosenbloom, then at the Center for Human Rights and International Justice at Boston College, testified that her Center was aware of at least eight cases of U.S. citizens who had been deported; she noted that "such mistakes are virtually *inevitable* under our current deportation laws." *Problems with ICE Interrogation, Detention, and Removal Procedures: hearing before the Subcomm. On Immigration, Citizenship, Refugees, Border Security, and International Law*, 110th Cong., at 3 (2008) (Statement of Rachel E. Rosenbloom). Rosenbloom cited three cases where U.S. citizens with mental disabilities had been detained and deported by ICE in the absence of rigorous safeguards and due process protections, noting "our current deportation system lacks even the most basic safeguards for someone who is delusional, has difficulty communicating or processing information, or is otherwise unable to effectively state a citizenship claim or other defense to removal." *Id*. at 8.

66.    On February 27, 2008, attorneys at the American Civil Liberties Union of Southern California and the law firm of Morrison & Foerster filed a lawsuit on behalf of Pedro Guzman, a U.S. citizen with developmental disabilities whom ICE deported to Mexico in May 2007.

67.    The November 2008 Hayes Memo states that "[a]ll officers who encounter an individual who they have reason to believe is in the United States in

violation of law . . . but who claims U.S. citizenship, shall immediately notify the Field Office Director ('FOD') through their chain of command. The FOD shall make the appropriate notification to DRO headquarters."

68.    The Hayes Memo further requires that all "[i]nterviews with detainees making claims to U.S. citizenship . . . will be recorded as sworn statements and include all questions needed to complete all fields on a Form I-213. In addition, the sworn statement must include probative questions designed to elicit information sufficient to allow an investigation of the person's claim of citizenship [including] vital records, family interviews, and other appropriate investigative measures."

69.    With regard to claims of U.S. citizenship made prior to the commencement of formal removal proceedings, the FOD must consult with DRO headquarters and local Office of Chief Counsel ("OCC") to assess the sufficiency of the evidence supporting removal. Where a claim of citizenship is made after the issuance of an NTA, "each OCC, in consultation with the FOD, who where necessary, should consult with HQ DRO, will determine the most appropriate course of action with respect to the disposition of the NTA and termination of the case, while providing any necessary advice to the FOD as to changes to the individual's custody conditions."

70.    Under the Hayes Memo, each ICE FOD "shall ensure that all DRO employees in their area of responsibility (inclusive of those state, local or tribal cross-trained 287(g) officers) who are under their control, understand and adhere to this policy."

71.    The Hayes Memo was superseded by a subsequent memorandum issued on November 19, 2009 by Assistant Secretary John Morton (the "Morton Memo"), who circulated the superseding guidance to not only all ICE FOD, but also all ICE Special Agents in Charge, and Chief Counsels.

72.    The Hayes Memo, while stating that field officers were responsible for ensuring that detainee claims to U.S. citizenship were "appropriately reported and investigated", did not provide any mandatory procedures or standards for the type of investigation that deportation officers were required to undertake in order to investigate and authenticate a claim of U.S. citizenship. While requiring ICE officers to interview claimants of U.S. citizenship and to record  questions and answers in a sworn statement, the Hayes Memo suggests that ICE officers conducting the interview "may" (not *must*) conduct "vital records searches, family interviews, and other appropriate investigative measures." Under this memorandum, there is no guidance for what type or level of investigation must be conducted and what must be demonstrated to supervisors in order to sustain charges against the individual as a removable alien.

73.    While the guidance provided by the Hayes Memo was woefully insufficient to ensure that Mr. Lyttle's claim to U.S. citizenship was appropriately investigated, upon information and belief, the ICE officers did not even perform the minimal inquiries required of them under the Hayes Memo. Upon information and belief, in Mr. Lyttle's case, ICE officers never informed the Field Office Director or any other ICE staff, including DRO headquarters and local Office of Chief Counsel, with regard to Mr. Lyttle's claim to U.S. citizenship.

74.    The Morton Memo substantially revised and expanded the obligations of ICE agents and officers who learn of a claim to U.S. citizenship by a suspected alien, including, for instance, involving Office of Investigations and Office of Principal Legal Advisor's personnel to evaluate the evidence in support of the claim to U.S. citizenship and to assess the evidence of alienage. "In all cases, any uncertainty about whether the evidence is probative of U.S. citizenship should weigh against detention."

### *ICE Agents Disregarded Mr. Lyttle's Claims To U.S. Citizenship And Violated The Clear Directives Of The Hayes Memo, Coercing and Manipulating Mr. Lyttle Into Signing Additional Conflicting Statements*

75.    On or about November 12, 2008, Mr. Lyttle was subjected to yet another interrogation, this time by ICE Defendant Marco Mondragon. Defendant Mondragon recorded Mr. Lyttle's sworn responses to the questions on the "Record of Sworn Statement in Affidavit Form."

76.    During Defendant Mondragon's interrogation, Mr. Lyttle informed Defendant Mondragon that he was a U.S. citizen.  Mr. Lyttle also provided answers to Defendant Mondragon's questions that Defendant Mondragon struck through and replaced with different answers, creating a conflicting, inconsistent and factually inaccurate record.

77.    Defendant Mondragon disregarded Mr. Lyttle's claim of citizenship, the apparent mental disabilities limiting Mr. Lyttle's capacity to comprehend the gravity of the situation, and the independent evidence of Mr. Lyttle's citizenship.

78.    Defendant Mondragon coerced and manipulated Mr. Lyttle into signing and initialing the Affidavit affirming that his name was "Jose Thomas," and that Mr. Lyttle's father was a citizen of Mexico who was also named "Jose Thomas."

### *Mr. Lyttle Attempted Suicide While In ICE Custody*

79.    Under standard operating procedure, inmates at SDC are not permitted to administer their own medication, but instead are given medication by health care professionals on an as needed basis, in part, to prevent abuse, misuse and possible overdoses by inmates.  By its terms the IGSA between Stewart County and ICE requires CCA to be solely responsible for the monitoring detainees with behavioral problems and closely observing those detainees who pose a suicide risk.

80.    The IGSA also mandates that the United States Public Health Service ("PHS") shall be responsible for the provision and administration of all health care services for detainees in ICE custody at SDC, which is operated by CCA.  PHS is required under the IGSA to provide medical care coverage at the facility twenty-four hours a day, seven days a week, and shall provide medical screening of all detainees upon arrival.

81.    As a diabetic, Mr. Lyttle requires daily medication to control his blood sugar levels.  On or about November 17, 2008, PHS Doe Defendants provided Mr. Lyttle, or provided Mr. Lyttle's CCA escort, with approximately 60 tablets of Glucophage, a medication prescribed for the treatment of type 2 diabetes milletus.  Mr. Lyttle was given no warnings or instructions as to the proper dosages.

82.    CCA employees escorted Mr. Lyttle back to his cell at SDC with the full bottle of Glucophage pills.

83.    On that same day, Mr. Lyttle ingested all 60 glucophage pills in an attempt to commit suicide.  Within hours, Mr. Lyttle developed severe abdominal pains and nausea and was rushed to the Emergency Room at Doctors Hospital Columbus in Columbus, Georgia.

84.    Mr. Lyttle was treated for toxic drug overdose at Doctors Hospital in Columbus, Georgia. Mr. Lyttle was held and monitored for several days on suicide watch, and released back to SDC after his condition improved.

### *Mr. Lyttle Was Ordered Removed From The United States*

85.    After his discharge from Doctors Hospital, Mr. Lyttle was transferred back to SDC to await his hearing before the immigration court.

86.    On or about December 9, 2008, without providing Mr. Lyttle any opportunity to present evidence on his own behalf or to review or challenge the evidence purportedly proving Mr. Lyttle's Mexican citizenship, Judge Cassidy issued an "Order of the Immigration Judge" ordering that Mr. Lyttle, a United States citizen, be removed to Mexico.

87.    Despite Mr. Lyttle's acknowledged mental disabilities, the immigration judge made no attempt to assess whether Mr. Lyttle was competent to proceed in his removal proceedings unrepresented; whether he was competent to waive his right to seek counsel to represent him; or whether other safeguards were necessary in order to insure that he received a fair hearing.

88.    A respondent in immigration court is entitled to a fair hearing, including "a reasonable opportunity to examine and object to the evidence against him or her, to present evidence in his or her own behalf and to cross-examine witnesses presented by the government." 8 CFR § 1240.10(a)(4). Recognizing that

respondents with mental disabilities may be unable to have a reasonable opportunity to participate in removal proceedings, the INA requires the Attorney General to provide procedural "safeguards" for people in removal proceedings who are incompetent due to serious mental disability and who are therefore not able to be "present" at their proceedings. *See* 8 U.S.C. § 1229a(b)(3).

89.    The Attorney General's delegate, EOIR, has acknowledged the absence of needed procedures concerning treatment of people with mental disabilities in the detention and removal system. Yet, to date, no meaningful safeguards exist to ensure due process in removal proceedings for people with mental disabilities.

90.    Although the Attorney General, Secretary of Homeland Security and corresponding agencies have yet to provide meaningful safeguards, certain minimal regulations do exist. Notably, immigration judges are prohibited from accepting admissions of alienage from unrepresented, incompetent respondents, 8 C.F.R. § 1240.10(c), and the Department of Homeland Security is not allowed to serve charging documents upon a known mentally incompetent person, 8 C.F.R. § 103.5a(c)(2).

91.    In Mr. Lyttle's case, the immigration court did not even avail itself of these minimal regulatory safeguards to ensure a fair hearing. Despite documentation of Mr. Lyttle's mental disabilities, his lack of legal representation,

and his statements in immigration court that he was a U.S. citizen, the immigration judge relied upon his alleged statement that he was a Mexican national, in violation of 8 C.F.R. § 1240.10(c). As a result, Mr. Lyttle was subjected to an unfair immigration proceeding that denied him a fair and meaningful opportunity to protect his rights and led to his illegal deportation from the United States.

### *Mr. Lyttle's Removal*

92.    On or about December 12, 2008, Defendant ICE Field Office Director Raymond Simonse or an ICE Doe Defendant performed an additional criminal background search of Mr. Lyttle's state records from North Carolina and Virginia, and pulled electronic records from various federal agencies. The ICE Defendants' December 12, 2008 database search once again uncovered numerous references to Mr. Lyttle's United States citizenship and his Social Security Number.

93.    Three days later, in disregard of consistent and overwhelming record evidence of Mr. Lyttle's U.S. citizenship, ICE Defendant Simonse issued a Warrant of Removal/Deportation declaring that Mr. Lyttle "[was] subject to removal/deportation from the United States, based upon a final order by: an immigration judge."

94.    The actions of the above-referenced ICE Defendants, including but not limited to Defendants Collado, Moten, Mondragon, and Simonse were carried out pursuant to policies, patterns, practices, or customs of the IGSA and/or ICE to:

- Select inmates to detain, interrogate, and deport based on their race and/or ethnicity;

- Unreasonably and unlawfully deny inmates who have a mental illness and/or cognitive impairments adequate assistance to (1) understand the nature of their rights during an interrogation; (2) prevent coercive and manipulative tactics, and (3) ensure that any waiver of rights made by these individuals is knowing, intelligent, and voluntary, in violation of applicable federal laws and regulations; and/or

- Fail to investigate claims to U.S. citizenship, unreasonably and unlawfully detain, interrogate, transport, and deport individuals in violation of due process.

95.    The practices and procedures implemented by ICE and the Georgia Doe Defendants to process Mr. Lyttle, to determine that he was unlawfully present in the United States, and to coerce him into signing documents containing inaccurate and contradictory statements are part of a pattern, custom, and habit by ICE and the Georgia Doe Defendants and their personnel to presume foreign citizenship of inmates based on their race, ethnicity, appearance, and/or surname. These policies, patterns, practices, and customs had been known to supervisory and policy-making officers throughout ICE and the Georgia Doe Defendants prior to December 2008. Despite their knowledge of these illegal policies, patterns, practices, and customs, the supervisory and policy-making officers have not effectively disciplined, trained or otherwise properly supervised the individuals

who engaged in and furthered these policies, patterns, practices and customs; have not effectively trained the Georgia Doe Defendants officers and ICE agents with regard to the proper constitutional and statutory limits of the exercise of their authority; and have sanctioned the policies, patterns, practices and customs of same through their deliberate indifference to the effect of these policies, patterns, practices and customs on other individuals in the custody of ICE.

96.    The supervisory and policy-making officers have taken no effective action to ensure that (1) the selection of inmates and detainees subject to interrogation, extended detention, and removal is not unreasonably and unlawfully based on their race and/or ethnicity; (2) individuals who have cognitive impairment or mental illness(es) received adequate protection and assistance to understand the nature of the situation, the scope of their rights during an interrogation, and the gravity of the situation in order to prevent coercive and manipulative interrogation tactics, and ensure that any waiver of rights made by such individuals is knowing, informed and voluntary; and (3) individuals are not unreasonably and unlawfully interrogated, detained, transported, and deported in violation of due process.

97.    As a consequence of the aforementioned acts and omissions, ICE, the ICE Defendants, and the Georgia Doe Defendants failed to undertake a reasonable and diligent inquiry into the citizenship of Mr. Lyttle based upon readily available documentation.

98.    ICE personnel failed to adequately train and supervise CCA and the Georgia Doe Defendants. ICE personnel failed to review records in the possession of CCA and the Georgia Doe Defendants and ICE which clearly identify Mr. Lyttle as being born in the United States.

99.    Mr. Lyttle's medical and criminal records show that he was unable to execute a knowing, voluntary, and intelligent waiver of his legal rights so as to admit that he was a Mexican national, in effect consenting to removal to Mexico. The failure to examine and appreciate the significance of official records reflects a deliberate indifference by ICE, the ICE Defendants, CCA and the Georgia Doe Defendants to the rights and well-being of Mr. Lyttle and is a further example of intentional racial discrimination by these individuals which has become so commonplace under the policies, patterns, practices, and customs implemented by Defendants.

100.    Even if Mr. Lyttle had been unlawfully present in the United States -- which he was not -- the individuals who encountered, interrogated and processed Mr. Lyttle failed to make even the slightest effort to confirm Mr. Lyttle's claim to U.S. citizenship. Mr. Lyttle's criminal history and other readily-available records, some already in ICE's possession, confirmed that Mr. Lyttle was a U.S. citizen born in North Carolina. The ICE Defendants' and Georgia Doe Defendants' failure to adequately examine these records was a direct consequence of inadequate

training and supervision and reflects a deliberate indifference by ICE and the Georgia Doe Defendants to the rights and well-being of inmates who are, or are perceived to be, racially/ethnically Latino.

101.   As a direct and foreseeable consequence of the practices and procedures utilized, Mr. Lyttle was placed by ICE personnel on a plane to Hidalgo, Texas on or about December 18, 2008.  When the plane touched down, Mr. Lyttle was transported to the Mexican border, forced to disembark and sent off on foot into Mexico, still wearing the prison-issued jumpsuit from Stewart Detention Center.

### Mr. Lyttle In Central America

102.   From the date of his illegal deportation, Mr. Lyttle spent the next four months in Central America, alternatively homeless, staying in shelters, or imprisoned by national authorities for lack of proper identification.

103.   When Mr. Lyttle was unlawfully removed from the United States and deported to Mexico against his will, he spoke no Spanish, was completely unfamiliar with Mexico and had approximately three dollars in his pocket.

104.   After eight days of begging, sleeping in the streets and trying to find shelter, Mr. Lyttle attempted to cross back into the United States at the Hidalgo, Texas border crossing.

- 33 -

105.   On or about December 29, 2008, Mr. Lyttle was detained by Custom and Border Patrol ("CBP") agents at the Hidalgo, Texas port of entry ("POE").

106.   Mr. Lyttle repeatedly informed the CBP agents at the Hidalgo POE that he was a U.S. citizen from North Carolina.

107.   While in CBP custody, CBP agents interrogated Mr. Lyttle in Spanish.  Unable to understand any Spanish, Mr. Lyttle did not respond to the CBP agents' questioning.

108.   CBP agents then searched a computerized database and found record of Mr. Lyttle's deportation earlier that month.  CBP agents noted on the Form I-213 that Mr. Lyttle was a "prior deported alien" and was to be "processed for expedited removal[,] returned to Mexico in the custody of Mexican Immigration."

109.   In violation of the agency's regulations, Mr. Lyttle was never provided a copy of the expedited removal form, nor was he allowed to review its contents or have the entries read to him.  Nor, as required by regulations, was he referred to an immigration judge for a "claimed status review."

110.   Having discounted and disregarded Mr. Lyttle's claims to U.S. citizenship, CBP agents transported Mr. Lyttle back to the custody of the Mexican Immigration officials.

111.   Mr. Lyttle spent the next 115 days wandering in Central America.

112.   In Mexico, Mr. Lyttle was eventually picked up by missionaries who arranged for transportation to Mexico City and attempted to assist Mr. Lyttle by instructing him to find the American embassy. Instead, upon arriving in Mexico City, Mexican Immigration officials arrested Mr. Lyttle who, unable to prove his Mexican citizenship, was deported to Honduras.

113.   Mr. Lyttle was placed in handcuffs and transported by bus to Honduras. In Honduras, immigration officials arrested Mr. Lyttle and placed Mr. Lyttle in an immigration camp. Ultimately, Mr. Lyttle was transferred from the Honduran immigration camp to a jail housing criminals, where he suffered severe physical and mental abuse by the guards of the prison.

114.   Mr. Lyttle was released from the Honduran jail only after public pressure and a media campaign in Honduras exposed the harsh and inhumane treatment of Mr. Lyttle.

115.   Throughout his 4-month odyssey, Mr. Lyttle would be arrested and incarcerated in Mexico, Honduras, and Nicaragua on the grounds that he could not produce evidence of his identity or citizenship.

116.   Ultimately, Mr. Lyttle found his way to Guatemala, where he managed to locate the U.S. Embassy in Guatemala City. At the U.S. Embassy in Guatemala, Mr. Lyttle met with an embassy employee who took the time to listen to Mr. Lyttle's story.

117.   For the first time since he was initially misidentified as a Mexican national over six months earlier, an employee of the U.S. Embassy in Guatemala made the effort to verify Mr. Lyttle's claim to U.S. citizenship.  Based on nothing more than the names of his brothers and his birthplace, the embassy employee was able to locate Mr. Lyttle's brothers, both of whom serve in the U.S. military.  Mr. Lyttle's family arranged for copies of his adoption records to be sent to the U.S. Embassy in Guatemala, and a passport was issued and printed to Mr. Lyttle within 24 hours.

### Mr. Lyttle's Return Home To The United States

118.   Mr. Lyttle's family scrambled to coordinate his return to the United States, wiring funds to Mr. Lyttle and purchasing an airline ticket for his flight home.  On April 22, 2009, more than 4 months after being illegally deported, Mr. Lyttle boarded a plane in Guatemala City bound for Nashville, Tennessee.

119.   Upon landing in Atlanta, Georgia to pass through customs, Mr. Lyttle was stopped and again detained by ICE agents.  Relying on records database search that identified Mr. Lyttle as an alien with "a lengthy criminal history," ICE Agents Charles Johnston and Brian Keys detained and interrogated Mr. Lyttle.

120.   Mr. Lyttle repeatedly proclaimed his U.S. citizenship to Defendants Johnston and Keys, recounting his ordeal in Mexico, Honduras, Nicaragua, and

Guatemala -- all of which was noted by Defendant Johnston and/or Keys in the Form I-213, Record of Deportable/Inadmissible Alien.

121. Mr. Lyttle informed Defendants Johnston and/or Keys that his brother had sent copies of his adoption papers to the U.S. Embassy in Guatemala in order to verify Mr. Lyttle's citizenship and secure Mr. Lyttle a passport.

122. During his interrogation, Defendant Johnston asked Mr. Lyttle what documents he presented to gain entry into the United States, and Mr. Lyttle replied, "I showed them my American citizen passport and my ticket."

123. Defendant Johnston discredited Mr. Lyttle's passport stating that "You do not appear to be admissible or have the required papers authorizing your admission to the United States."

124. That same day, April 22, 2009, copies of Mr. Lyttle's adoption records and passport were faxed to the ICE Defendants detaining Mr. Lyttle in Atlanta, including Defendants Johnston and Keys.

125. On April 23, 2009, without taking any steps to verify Mr. Lyttle's claims to U.S. citizenship and without making any effort to locate Mr. Lyttle's family members or independently substantiate the validity of the adoption records or the passport issued by the embassy in Guatemala, ICE Defendants Johnston and Keys issued an expedited removal order against him.

126.    In filling out the form entitled "Notice and Order of Expedited Removal," Defendants Johnston and Keys alleged that Mr. Lyttle was "not a citizen or national of the United States; You are a native of Mexico and a citizen of Mexico." ICE Defendants Johnston and Keys further alleged that Mr. Lyttle falsely presented himself as a U.S. citizen by using the passport issued by the U.S. Embassy in Guatemala.

127.    Mr. Lyttle was detained in Atlanta, facing deportation and removal from the United States for the third time in five months, when his family members, who had become worried about his failure to arrive in Tennessee as planned, were able to secure an attorney who located Mr. Lyttle and demanded his release.

128.    Mr. Lyttle was released from ICE custody on April 24, 2009.

129.    On April 28, 2009, the Department of Homeland Security filed a two-page motion seeking to terminate the deportation efforts aimed at Mr. Lyttle, stating that "it was determined that Respondent [Mr. Lyttle] was not a Mexican citizen, and, in fact, is a citizen of the United States." [See Department of Homeland Security's Motion to Terminate Removal Proceedings at 2, attached hereto as Exhibit C.] To date, no government official has ever offered any explanation or apology to Mr. Lyttle.

130.    As a direct and foreseeable consequence of his illegal deportation, Mr. Lyttle suffered and continues to suffer grievous physical and psychological injury.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Fifth Amendment to the U.S. Constitution / Due Process)**
***(Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics)***
**(Against Defendants Hayes, Simonse, Collado, Mondragon, Moten, Moore, Johnston, Keys and ICE Does 1-10)**

131.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 130 of this Complaint.

132.   By illegally, arbitrarily, and capriciously detaining Mr. Lyttle, a United States citizen, and/or causing his deportation to Mexico, ICE Defendants Hayes, Simonse, Collado, Mondragon, Moten, Moore, Johnston, Keys, and/or the ICE Doe Defendants deprived Mr. Lyttle of his constitutional right to liberty without due process of law in violation of the Fifth Amendment to the United States Constitution. Defendants deprived him of his liberty and/or caused Mr. Lyttle to be deported without reasonable basis or lawful authority.

133.   ICE Defendants Hayes, Simonse, Collado, Mondragon, Moten, Moore, Johnston, Keys, and/or the ICE Doe Defendants acted under color of law and acted or purported to act in the performance of official duties under federal, state, county, or municipal laws, ordinances, or regulations.

134.   ICE Defendants Hayes, Simonse, Collado, Mondragon, Moten, Moore, Johnston, Keys, and/or the ICE Doe Defendants' conduct violated clearly

established constitutional or other rights of which these ICE Defendants knew, or of which a reasonable public official should have known.

135.    These ICE Defendants' actions, omissions, policies, patterns, practices, and customs, as complained of herein, were intentional and reckless and demonstrate a callous disregard for, or deliberate indifference to, Mr. Lyttle's personal safety, security, freedom, and civil and constitutional rights.

136.    These violations are compensable under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). As a direct and proximate result of the unlawful actions of these Defendants, Mr. Lyttle has suffered economic damages and significant physical and emotional harm.

## SECOND CLAIM FOR RELIEF

### (Fifth Amendment to the U.S. Constitution / Equal Protection)
### *(Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics)*
### (Against Defendants Hayes, Simonse, Collado, Mondragon, Moten, Moore, Johnston, Keys and ICE Does 1-10)

137.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 130 of this Complaint.

138.    By illegally detaining Mr. Lyttle and/or causing his deportation to Mexico, ICE Defendants deliberately and unconstitutionally discriminated against Mr. Lyttle on the basis of his race and ethnicity so as to deny him equal protection of the law in violation of the Fifth Amendment to the United States Constitution.

139.    ICE Defendants Hayes, Simonse, Collado, Mondragon, Moten, Moore, Johnston, Keys, and/or the ICE Doe Defendants and certain other named unknown ICE Doe Defendants acted under color of law and acted or purported to act in the performance of official duties under federal, state, county, or municipal laws, ordinances, or regulations. ICE Defendants acted with the intent or purpose to discriminate against Mr. Lyttle.

140.    These ICE Defendants' conduct violated clearly established constitutional or other rights of which these ICE Defendants knew, or of which a reasonable public official should have known.

141.    These ICE Defendants' actions, omissions, policies, patterns, practices, and customs, as complained of herein, were intentional and reckless and demonstrate a callous disregard for, or deliberate indifference to, Mr. Lyttle's personal safety, security, freedom, and civil and constitutional rights.

142.    These violations are compensable under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). As a direct and proximate result of the unlawful actions of these Defendants, Mr. Lyttle has suffered economic damages and significant physical and emotional harm.

## THIRD CLAIM FOR RELIEF

**(Fourth Amendment to the U.S. Constitution)**
***(Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics)***
**(Against Defendants Hayes, Simonse, Collado, Mondragon, Moten, Moore,
Johnston, Keys and ICE Does 1-10)**

143.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 130 of this Complaint.

144.   ICE Defendants Hayes, Simonse, Collado, Mondragon, Moten, Moore, Johnston, Keys, and/or the ICE Doe Defendants intentionally detained Mr. Lyttle in violation of his constitutional right to be free from unreasonable seizures, as guaranteed by the Fourth Amendment to the United States Constitution.

145.   These ICE Defendants acted under color of law and acted or purported to act in the performance of official duties under federal, state, county, or municipal laws, ordinances, or regulations.

146.   These ICE Defendants' conduct violated clearly established constitutional or other rights of which ICE Defendants knew, or of which a reasonable public official should have known.

147.   These ICE Defendants' actions, omissions, policies, patterns, practices, and customs, as complained of herein, were intentional and reckless and demonstrate a callous disregard for, or deliberate indifference to, Mr. Lyttle's personal safety, security, freedom, and civil and constitutional rights.

148.   These violations are compensable under *Bivens v. Six Unknown*

*Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). As a direct

and proximate result of the unlawful actions of these Defendants, Mr. Lyttle has

suffered economic damages and significant physical and emotional harm.

### FOURTH CLAIM FOR RELIEF

**(Fifth Amendment to the U.S. Constitution / Due Process;
The Immigration and Nationality Act;
Section 504 of The Rehabilitation Act of 1973)
(Damages and Injunctive Relief to Protect Mentally Disabled Persons
from Illegal Deportation)
(Against Defendants Napolitano, Snow, Morton and Hayes)**

149.   Plaintiff realleges and incorporates herein by reference each and every

allegation contained in paragraphs 1 through 130 of this Complaint.

150.   As Secretary of the Department of Homeland Security, Defendant

Napolitano is charged with the operation of a Federally-funded government agency

under 29 U.S.C. § 794.

151.   As Director of the Executive Office of Immigration Review,

Defendant Snow is charged with the operation of a Federally-funded government

agency under 29 U.S.C. § 794.

152.   As Assistant Secretary of U.S. Immigration and Customs

Enforcement, Defendant Morton is charged with the operation of a Federally-

funded government agency under 29 U.S.C. § 794.

153. As the Director of the Office of Detention and Removal within ICE, Defendant Hayes is charged with the operation of a Federally-funded government agency under 29 U.S.C. § 794.

154. Mr. Lyttle qualifies as an "individual with a disability" under 29 U.S.C. § 705 and 42 U.S.C. § 12102 by virtue of his significant cognitive disorders and mental disabilities and apparent developmental disabilities.

155. Section 504 of the Rehabilitation Act makes it unlawful to discriminate against an individual with a mental disability by denying that individual the benefits and protections afforded other non-disabled individuals.

156. These Defendants had a duty under Section 504 of the Rehabilitation Act to promulgate, implement and maintain adequate policies and safeguards to protect against discrimination against individuals with mental and developmental disabilities in the provision of their services and to ensure that the personal and civil rights of individuals receiving services while in the custody of the federal government or its designated agent are protected.

157. The Due Process Clause requires that all people, including individuals with mental disabilities like Mr. Lyttle, receive fair hearings when placed in proceedings for removal from the United States.

158. The Immigration and Nationality Act's requirement that all people in removal proceedings be afforded a reasonable opportunity to examine and present

evidence and witnesses, *see* 8 U.S.C. 1229a(b)(4)(B), requires that unrepresented individuals who are not mentally competent to represent themselves be afforded appointed counsel in their immigration detention and removal proceedings, if they are unable to secure counsel by other means.

159.    These Defendants' failure to provide adequate and meaningful safeguards for people with mental disabilities in the immigration detention and court systems resulted in his misidentification as a noncitizen by ICE staff and, further, denied Mr. Lyttle a fair hearing.

160.    Defendants' failure to provide adequate and meaningful safeguards such as a right to counsel in immigration court for people with mental disabilities violates the INA's requirement that respondents have a reasonable opportunity to present evidence in court.

161.    These Defendants' failure to provide intake and processing safeguards resulted in the unlawful and unconstitutional presumption that Mr. Lyttle was a non-citizen unlawfully in the United States, and ultimately led to his identification as a Mexican national subject to deportation.

162.    These Defendants' actions, omissions, policies, patterns, practices, and customs, as complained of herein, were intentional and reckless and demonstrate a callous disregard for, or deliberate indifference to, Mr. Lyttle's mental disability.

163.   These Defendants' refusal and failure to promulgate and implement policies and procedures to adequately identify and assess individuals with mental disabilities and to provide those individuals with sufficient legal guidance and protections while in federal custody and subject to interrogation and judicial or quasi-judicial proceedings constitute discrimination in violation of Section 504 of the Rehabilitation Act, resulting in Mr. Lyttle's unconstitutional and unlawful removal from the United States.

164.   These violations are compensable under Section 505 of the Rehabilitation Act, and Mr. Lyttle is entitled to actual, compensatory and punitive damages as a direct and proximate result of the unlawful actions of these Defendants, which caused Mr. Lyttle irreparable injury.

165.   In light of the fact that Mr. Lyttle's mental disability has caused or contributed to his incarceration and detention in the past on more than one occasion, and in light of the fact that Mr. Lyttle was erroneously identified as a non-citizen and deported from the United States on more than one occasion, and threatened with deportation upon his return to the United States after over four months in Central America, Mr. Lyttle has suffered and is likely to again suffer irreparable injury, and is entitled to injunctive relief to avoid further injury.

## FIFTH CLAIM FOR RELIEF

### (Fifth Amendment to the U.S. Constitution / Due Process)
### (Injunctive Relief Sought to Protect U.S. Citizens from Illegal Deportation)
### (Against Defendants Holder, Napolitano, Snow, Morton and Hayes)

166.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 130 of this Complaint.

167.   The Due Process Clause requires that citizens of the United States of America be afforded adequate safeguards against unlawful removal from the country, including procedures reasonably calculated to verify the citizenship and nationality of individuals in state or federal custody.

168.   These Defendants' failure to provide adequate procedures and meaningful safeguards to verify the citizenship of detainees during the intake, identification and processing stages denied Mr. Lyttle his constitutional right to liberty without due process of law.  Such safeguards are especially warranted where, as here, the detainee expressly claims to be a U.S. citizen and government records are available to the custodial agency that would verify the citizenship of such individual.

169.   These Defendants' failure to provide intake and processing safeguards resulted in the unlawful and unconstitutional presumption that Mr. Lyttle was a

non-citizen unlawfully in the United States, and ultimately led to his identification as a Mexican national subject to deportation.

170. As a result of the patently inadequate procedures in which Mr. Lyttle was incorrectly labeled as a citizen of Mexico, Mr. Lyttle suffered irreparable injury.

171. In light of the fact that Mr. Lyttle was erroneously identified as a non-citizen and deported from the United States on more than one occasion, and threatened with deportation upon his return to the United States after over four months in Central America, Mr. Lyttle has suffered and is likely to again suffer irreparable injury, and is entitled to injunctive relief to avoid further injury.

## SIXTH CLAIM FOR RELIEF

### (False Imprisonment)
### (Federal Torts Claim Act)
### (Against Defendant United States of America)

172. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 130 of this Complaint.

173. ICE Defendants intentionally and unlawfully deprived Mr. Lyttle of his liberty by (1) obtaining custody of Mr. Lyttle from the North Carolina Defendants, (2) holding Mr. Lyttle, a United States citizen, in ICE custody for an appreciable period of time, and (3) physically expelling Mr. Lyttle from the national borders of the United States.

174.    These ICE Defendants were acting within the scope of their employment when they committed these acts.

175.    Mr. Lyttle never consented to ICE's apprehension, arrest, detention, or deportation of him.

176.    As a direct and proximate result of these ICE Defendants' conduct, Mr. Lyttle has suffered and continues to suffer damages in an amount to be proven at trial.

177.    Mr. Lyttle filed a claim with the Department of Homeland Security based on these injuries in accordance with the Federal Tort Claims Act.  More than six (6) months passed since Mr. Lyttle filed his FTCA claim with the Department of Homeland Security, and Mr. Lyttle has received no response.

## SEVENTH CLAIM FOR RELIEF

### (Negligence)
### (Federal Torts Claim Act)
### (Against Defendant United States of America)

178.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 130 of this Complaint.

179.    ICE Defendants breached their duty of reasonable care by negligently acting or failing to act in such a way that resulted in Mr. Lyttle's wrongful detention and deportation by ICE, which these Defendants knew or should have known posed a substantial risk of grave harm to Mr. Lyttle.

- 49 -

180. ICE Defendants were negligent in performing their duties and failed, neglected and/or refused to properly and fully discharge their responsibilities by, among other things:

- Failing to review readily available documentation, which stated that Mr. Lyttle was born in the United States and possessed a valid Social Security Number;

- Failing to investigate Mr. Lyttle's claims that he was born in Rowan County, North Carolina;

- Coercing and manipulating Mr. Lyttle to sign Form I-826;

- Failing to provide Mr. Lyttle, who has a mental illness and/or mental disabilities, with assistance to (1) understand his rights, (2) read and understand Form I-826, and (3) protect him from coercive interrogation tactics;

- Creating and/or sanctioning policies, patterns, practices, and customs of selecting inmates to detain, interrogate, and deport based on their race and/or ethnicity;

- Failing to adequately train and supervise personnel performing immigrations duties; and

- Detaining, holding and deporting a United States citizen.

181. These ICE Defendants were acting within the scope of their employment when they committed these acts.

182.    As a direct and proximate result of ICE Defendants' conduct, Mr. Lyttle has suffered and continues to suffer damages in an amount to be proven at trial.

183.    Mr. Lyttle filed a claim with the Department of Homeland Security based on these injuries in accordance with the Federal Tort Claims Act.  More than six (6) months passed since Mr. Lyttle filed his FTCA claim with the Department of Homeland Security, and Mr. Lyttle has received no response.

## EIGHTH CLAIM FOR RELIEF

### (Negligence)
### (Federal Torts Claim Act)
### (Against Defendant United States of America)

184.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 130 of this Complaint.

185.    PHS breached its duty of reasonable care by negligently acting or failing to act in such a way that resulted in the administration of sixty Glucophage pills to Mr. Lyttle while in ICE custody.  Mr. Lyttle's possession of medication of this variety and in this quantity posed an apparent and grave risk of harm to Mr. Lyttle, of which Defendants knew or should have known.

186.    PHS Doe Defendants were negligent in performing their duties and failed, neglected and/or refused to properly and fully discharge their responsibilities by, among other things:

- 51 -

- Administering a potentially fatal dose of medication to an individual with known and documented psychological problems;

- Failing to properly warn and instruct Mr. Lyttle and the CCA employees charged with escorting Mr. Lyttle to and from SDC about the proper dosages and administration of the diabetes medication; and

- Failing to adequately train and supervise personnel performing the medical health care administration at SDC.

187.    These Defendants were acting within the scope of their employment when they committed these acts.

188.    As a direct and proximate result of PHS Doe Defendants' conduct, Mr. Lyttle has suffered and continues to suffer damages in an amount to be proven at trial.

189.    Mr. Lyttle filed a claim with the Department of Homeland Security based on these injuries in accordance with the Federal Tort Claims Act.  More than six (6) months passed since Mr. Lyttle filed his FTCA claim with the Department of Homeland Security, and Mr. Lyttle has received no response.

## NINTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress)
### (Federal Torts Claim Act)
### (Against Defendant United States of America)

190.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 130 of this Complaint.

191.   ICE Defendants' willful acts constitute outrageous conduct insofar as they were intended to cause Mr. Lyttle to be held in ICE custody, interrogated, and expelled from the national borders of the United States.

192.   ICE Defendants intended to cause Mr. Lyttle emotional distress, and/or acted in reckless disregard of the likelihood of causing Mr. Lyttle emotional distress, in committing these acts.

193.   ICE Defendants were acting within the scope of their employment when they committed these acts.

194.   As a direct and proximate result of ICE Defendants' acts, Mr. Lyttle suffered and continues to suffer severe mental anguish and emotional and physical distress.

195.   Mr. Lyttle has incurred and continues to incur medical expenses and other damages in an amount to be proven at trial.

196.   Mr. Lyttle filed a claim with the Department of Homeland Security based on these injuries in accordance with the Federal Tort Claims Act.  More than six (6) months passed since Mr. Lyttle filed his FTCA claim with the Department of Homeland Security, and Mr. Lyttle has received no response.

## TENTH CLAIM FOR RELIEF

**(Fifth and Fourteenth Amendments to the United States Constitution)**
*(42 U.S.C. § 1983)*
**(Against CCA and Georgia Does 1-10)**

197.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 130 of this Complaint.

198.   CCA and the Georgia Doe Defendants deprived Mr. Lyttle of his constitutional right to liberty and deprived him of this liberty without due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution by causing and/or participating in the illegal, arbitrary, and capricious deportation of Mr. Lyttle, a United States citizen, to Mexico. Defendants caused and/or participated in Mr. Lyttle's deportation without reasonable basis or lawful authority.

199.   CCA and the Georgia Doe Defendants acted under color of law and acted or purported to act in the performance of official duties under federal, state, county, or municipal laws, ordinances, or regulations.

200.   The conduct of CCA and the Georgia Doe Defendants violated clearly established constitutional or other rights, of which Defendants knew, or of which a reasonable public official should have known.

201.   The actions, omissions, policies, patterns, practices and customs of these Defendants, complained of herein, were intentional, reckless, and show a

callous disregard for, or deliberate indifference to Mr. Lyttle's personal safety, security, freedom, and civil and constitutional rights.

202. These violations are compensable pursuant to U.S.C. § 1983. As a direct and proximate result of these Defendants' conduct, Mr. Lyttle has suffered economic damages and significant physical and emotional harm.

## ELEVENTH CLAIM FOR RELIEF

### (Fourteenth Amendment to the United States Constitution) *(42 U.S.C. § 1983)* (Against CCA and Georgia Does 1-10)

203. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 130 of this Complaint.

204. CCA and the Georgia Doe Defendants deliberately and unconstitutionally discriminated against Mr. Lyttle on the basis of his race and ethnicity so as to deny him equal protection of the law as guaranteed by the Fourteenth Amendment to the United States Constitution and his liberty by causing or participating in the illegal deportation of Mr. Lyttle.

205. CCA and the Georgia Doe Defendants acted under color of law and acted or purported to act in the performance of official duties under federal, state, county, or municipal laws, ordinances, or regulations. CCA and the Georgia Doe Defendants acted with the intent or purpose to discriminate against Mr. Lyttle.

- 55 -

206.    The conduct of these Defendants violated clearly established constitutional or other rights, of which Defendants knew, or of which a reasonable public official should have known.

207.    The acts, omissions, policies, patterns, practices, and customs of these Defendants complained of herein were intentional, reckless, and show a callous disregard for, or deliberate indifference to Mr. Lyttle's personal safety, security, freedom, and civil and constitutional rights.

208.    These violations are compensable pursuant to U.S.C. § 1983. As a direct and proximate result of these Defendants' conduct, Mr. Lyttle has suffered economic damages and significant physical and emotional harm.

## TWELFTH CLAIM FOR RELIEF

### (False Arrest and Imprisonment)
### (Georgia Common Law)
### (Against CCA and Georgia Does 1-10)

209.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 130 of this Complaint.

210.    CCA and the Georgia Doe Defendants intentionally and unlawfully deprived Mr. Lyttle of his liberty by (1) detaining Mr. Lyttle for over a month without a legal basis to do so; and (2) physically turning over custody of Mr. Lyttle to ICE; and (3) facilitating and assisting with Mr. Lyttle's removal from the United States.  Mr. Lyttle never consented to the detention or the arrest, and Mr. Lyttle

never consented to the wrongful deportation arising out of CCA's and the Georgia Doe Defendants' unlawful conduct.

211.  CCA and the Georgia Doe Defendants were acting within the scope of their employment when they committed these acts.

212.  As a direct and proximate result of CCA's and the Georgia Doe Defendants' conduct, Mr. Lyttle has suffered and continue to suffer damages in an amount to be proven at trial.

**THIRTEENTH CLAIM FOR RELIEF**
**(Negligence)**
**(Georgia Common Law)**
**(Against CCA and Georgia Does 1-10)**

213.  Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 130 of this Complaint.

214.  CCA and the Georgia Doe Defendants breached their duty of reasonable care by negligently acting or omitting to act in such a way that resulted in Mr. Lyttle's wrongful detention and deportation by ICE, which these Defendants knew or should have known posed a substantial risk of grave harm to Mr. Lyttle.

215.  CCA and the Georgia Doe Defendants were negligent in performing their duties and failed, neglected and/or refused to properly and fully discharge their responsibilities by, among other things:

> • Failing to review readily available documentation provided to ICE by the North Carolina Defendants, which stated that Mr. Lyttle

- 57 -

was born in the United States and possessed a valid Social Security Number;

- Failing to investigate Mr. Lyttle's claims that he was born in Rowan County, North Carolina;

- Failing to provide Mr. Lyttle, who has a mental illness and/or mental disability, with assistance to (1) understand his rights, (2) read and understand certain forms, and (3) protect him from coercive interrogation tactics;

- Creating and/or sanctioning policies, patterns, practices, and customs of selecting inmates to detain, interrogate, and deport based on their race and/or ethnicity;

- Failing to adequately train and supervise CCA personnel and Georgia Doe Defendants charged with safeguarding the welfare of detainees; and

- Detaining, holding and assisting in the deportation of a United States citizen.

216.   CCA and the Georgia Doe Defendants were acting within the scope of their employment when they committed these acts.

217.   As a direct and proximate result of CCA's and the Georgia Doe Defendants' conduct, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial.

## FOURTEENTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress)
### (Georgia Common Law)
### (Against CCA and Georgia Does 1-10)

218.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 130 of this Complaint.

219.   CCA's and the Georgia Doe Defendants' willful acts constitute outrageous conduct insofar as they were intended to cause Mr. Lyttle to be singled out and discriminated against because of his race and/or ethnicity, be unlawfully detained and be transferred to ICE custody for deportation.

220.   CCA and the Georgia Doe Defendants intended to cause Mr. Lyttle emotional distress, and/or acted in reckless disregard of the probability of causing Mr. Lyttle emotional distress in committing these acts.

221.   As a direct and proximate result of the actions of CCA and the Georgia Doe Defendants, Mr. Lyttle suffered and continues to suffer economic damages, severe mental anguish, and emotional and physical distress.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all Defendants, and each of them, as follows:

1.      For general damages against the United States, ICE Defendants, CCA and the Georgia Doe Defendants, jointly and severally, in an amount to be proven

at trial;

2.      For special damages against the United States, ICE Defendants, CCA and the Georgia Doe Defendants, jointly and severally, in an amount to be proven at trial;

3.      For punitive and exemplary damages against the ICE Defendants, CCA and the Georgia Doe Defendants, jointly and severally, in an amount to be proven at trial;

4.      For reasonable costs, expenses, and attorneys' fees pursuant to 42 U.S.C. § 1988, 29 U.S.C. § 794a, and any other applicable state and federal law;

5.      For injunctive relief against Defendants Holder, Snow, Napolitano and Morton, requiring the Attorney General, the Executive Office of Immigration Review, and the Department of Homeland Security to promulgate safeguards and policies as set forth herein and to adequately train and supervise employees in order to safeguard the rights of U.S. citizens and persons with mental disabilities subject to detention and possible deportation; and

6.      For such other relief as the Court deems just, equitable and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on any and all issues triable by a jury.

Respectfully submitted this 13th day of October, 2010.

**TROUTMAN SANDERS LLP**

MICHAEL E. JOHNSON
Georgia Bar No. 395039
michael.johnson@troutmansanders.com
BRIAN P. WATT
Georgia Bar No. 741841
brian.watt@troutmansanders.com
ALEXANDRIA J. REYES
Georgia Bar No. 428936
alex.reyes@troutmansanders.com
Bank of America Plaza, Suite 5200
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
(404) 885-3000 Tel
(404) 885-3900 Fax

***With Co-Counsel***:

**AMERICAN CIVIL LIBERTIES UNION**
**IMMIGRANTS' RIGHTS PROJECT**

*/s/ Judy Rabinovitz*
JUDY RABINOVITZ
*Pro Hac Vice Application Pending*
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2618
Facsimile: (212) 549-2654
jrabinovitz@aclu.org

*And:*

**AMERICAN CIVIL LIBERTIES UNION
OF GEORGIA FOUNDATION**

*/s/ Chara Fisher-Jackson*
CHARA FISHER-JACKSON
Georgia Bar No. 386101
ACLU of Georgia, Legal Director
AZADEH SHAHSHAHANI
Georgia Bar No. 509008
ACLU of Georgia, National Security/
Immigrants' Rights Project Director
1900 The Exchange, Suite 425
Atlanta, GA 30339
Telephone: (770) 303-8111

## <u>CERTIFICATION OF COUNSEL</u>

Pursuant to N.D. Ga. Local Rule 7.1 D, I hereby certify that this document is submitted in Times New Roman 14 point type as required by N.D. Ga. Local Rule 5.1(b).

BRIAN P. WATT