THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

MARK DANIEL LYTTLE,                *

    Plaintiff,                    *

vs.                               *

                                     CASE NO. 4:11-CV-152 (CDL)

UNITED STATES OF AMERICA,          *
*et al.*,
                              *

    Defendants.                   *
                              *

## O R D E R

    After being detained for fifty-one days by the United States Immigration and Customs Enforcement Division of the Department of Homeland Security ("ICE"), Mark Daniel Lyttle ("Lyttle"), a United States citizen with diminished mental capacity, was flown to Hidalgo, Texas, transported to the Mexican border, forced to disembark, and sent off on foot into Mexico with only three dollars in his pocket. Wearing his prison-issued jump suit from the Stewart Detention Center, a privately managed ICE facility in Georgia, and speaking no Spanish, Lyttle wandered around Central America for 125 days, sleeping in the streets, staying in shelters, and being imprisoned and abused in Mexico, Honduras, and Nicaragua because he had no identity or proof of citizenship. Ultimately, Lyttle found his way to the United States Embassy in Guatemala, where

an Embassy employee helped him contact his family in the United States to arrange for his return home.

In his Complaint, Lyttle alleges that ICE employees detained him without probable cause and subsequently deported him unlawfully to Mexico, knowing that he was a United States citizen with a diminished mental capacity.[1] Lyttle seeks damages from the responsible ICE officers in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau*

---

[1] It is undisputed that Lyttle is a U.S. citizen. Since "deportation" contemplates the removal of a *non-citizen*, it may be more precise to describe Lyttle's removal as "banishment," a process with ancient origins as described by Judge Pardee 105 years ago:

> "Ostracism. The word has no place in the vocabulary of American jurisprudence. It is derived from the Greek word 'ostrakon,' a shell, and, when the fickle populace of Athens desired to get rid even of their bravest and best, they voted with the ostrakon, and expelled him from the borders of the City of the Violet Crown. It is related of Aristides, that great Athenian statesman and one of the noble generals who fought against the countless hordes of Persians: 'Where the mountains look on Marathon, And Marathon looks on the sea,' that a jealous rival was attempting to procure his banishment by ostracism. A rustic citizen happened to be near Aristides himself in the public assembly which was about to decree his banishment, and turning to him, without knowing who he was, asked him how to write the name of Aristides upon the shell with which he was going to vote. 'Has Aristides injured thee?' inquired the great Athenian. 'No,' answered the voter, 'but I am tired of hearing him called "Aristides the Just."' And Aristides was ostracised. But on fuller knowledge of his character his fellow citizens reversed the decree of banishment."

*Greene v. United States,* 154 F. 401, 416 (5th Cir. 1907) (Pardee, J., dissenting) (quoting trial judge Emory Speer's jury charge). Although Lyttle may be no Aristides, he claims his banishment was just as arbitrary. The issue presented today is whether Lyttle, a U.S. citizen, has any legal remedy to vindicate his right to be free from such banishment, or in the language of Judge Pardee and Judge Speer, what remedy does a citizen of the United States have when his own country wrongfully "writes his name upon the ostrakon."

*of Narcotics,* 403 U.S. 388 (1971), for violating his constitutional right to be free from unreasonable seizure under the Fourth Amendment and his rights to due process and equal protection under the Fifth Amendment. Lyttle also asserts a claim against Hayes and several high-ranking government officials under Section 504 of the Rehabilitation Act of 1973, 28 U.S.C. § 794. He seeks injunctive relief against several high-ranking government officials in their official capacities to prevent his future detention and deportation. Finally, Lyttle claims he is entitled to money damages from the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 to 2680, contending that the conduct by the ICE officers amounted to false imprisonment, negligence, and intentional infliction of emotional distress.[2]

The individual federal defendants, David Collado, James Hayes, Charles Johnston, Brian Keys, Michael Moore, Marco Mondragon, Tracy Moten, and Raymond Simonse (collectively, "ICE Defendants"), filed a motion to dismiss the claims against them: claims 1 through 3, asserted against all ICE Defendants, and claim 4, asserted against Hayes (ECF No. 49). The ICE

---

[2] Specifically, Lyttle sued the United States, four official capacity federal defendants, eight individual capacity federal defendants, ICE Does 1–10, United States Public Health Service Does 1–10, the Corrections Corporation of America, and Georgia Does 1–10. Lyttle subsequently filed a consent motion dismissing Defendant Corrections Corporation of America with prejudice (ECF No. 78), and the Court granted the motion (ECF No. 79).

Defendants seek dismissal of Lyttle's *Bivens* claims for failure to state a claim based on three contentions: (1) no cause of action exists under *Bivens* and its progeny for the alleged conduct; (2) the alleged conduct does not establish a constitutional violation; and (3) they are entitled to qualified immunity.

Defendants Eric Holder, John Morton, Janet Napolitano, and Thomas Snow (collectively, "official capacity Defendants") and the United States filed a motion as to the claims against them, seeking to dismiss claims 4 through 7 and 9, and seeking summary judgment as to claim 8 (ECF No. 47). The official capacity Defendants seek dismissal of Lyttle's injunctive relief claims based in part on a lack of standing. And, the United States seeks dismissal of Lyttle's FTCA claims for lack of subject matter jurisdiction and failure to state a claim.

For the reasons discussed in the remainder of this Order, the Court dismisses the following claims: (1) the official capacity claims against James Hayes, Eric Holder, John Morton, Janet Napolitano, and Thomas Snow;[3] (2) the individual capacity *Bivens* equal protection claims as to all Defendants against whom they are asserted; (3) the individual capacity *Bivens* Fifth Amendment due process claims against Defendants Johnston, Keys,

---

[3] As discussed *infra* note 17, the Court construes claim 4 as being asserted against Hayes in his official capacity.

and Moore; and (4) the individual capacity *Bivens* Fourth Amendment unreasonable seizure claims against Johnston, Keys, and Moore.[4]   The following claims remain pending: (1) the *Bivens* Fifth Amendment due process claims against Defendants Collado, Moten, Mondragon, Simonse, and Hayes; (2) the *Bivens* Fourth Amendment unreasonable seizure claims against Defendants Collado, Moten, Mondragon, Simonse, and Hayes; (3) the Federal Tort Claims Act claims against the United States for false imprisonment, negligence, and intentional infliction of emotional distress.[5]

STANDARDS

The United States and the official capacity Defendants seek dismissal of the FTCA claims for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and alternatively for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).   The individual capacity Defendants seek to have the *Bivens* claims dismissed for

---

[4] Accordingly, no claims remain against Defendants Johnston, Keys, and Moore.

[5] The Court notes that Lyttle has alleged the following additional claims, which are not the subject of the pending motions to dismiss: (1) 42 U.S.C. § 1983 claims against Georgia Does 1-10; and (2) false arrest, false imprisonment, negligence, intentional infliction of emotional distress claims under Georgia law against Georgia Does 1-10. Lyttle also brought a FTCA negligence claim against the United States related to the medical care Lyttle received while detained (claim 8). The United States moved for summary judgment as to that claim, and the Court deferred ruling on the summary judgment motion until after ruling on the motion to dismiss.  Minute Entry, Oct. 14, 2011, ECF No. 70.   The Court terminates this motion so that the United States can re-file the motion once sufficient discovery has been conducted.

failure to state a claim under Rule 12(b)(6).  The standards for these motions are as follows.

## I.   Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendants' challenge to jurisdiction is a facial one which "require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction[.]" *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (per curiam) (second alteration in original) (internal quotation marks omitted).  To survive such a challenge, "[a] complaint must contain 'enough factual matter (taken as true) to suggest'" each required jurisdictional element. *Rance v. D.R. Horton, Inc.*, 316 F. App'x 860, 862 (11th Cir. 2008) (per curiam) (quoting *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007)).  "'It is sufficient if the complaint succeeds in identifying facts that are suggestive enough to render the element plausible.'" *Id.* (quoting *Watts*, 495 F.3d at 1296).

## II.  Motion to Dismiss for Failure to State a Claim

When considering a 12(b)(6) motion to dismiss, the Court must accept as true all facts set forth in the plaintiff's complaint and limit its consideration to the pleadings and exhibits attached thereto. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009).  The Court can properly consider documents

referred to in the complaint and not attached thereto without converting a 12(b)(6) motion to dismiss into a summary judgment motion if the documents are central to the plaintiff's claim and the authenticity is not challenged. *Speaker v. U.S. Dep't of Health & Human Servs.*, 623 F.3d 1371, 1379 (11th Cir. 2010).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). The complaint must include sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[A] formulaic recitation of the elements of a cause of action will not do[.]" *Id.* Although the complaint must contain factual allegations that "raise a reasonable expectation that discovery will reveal evidence of" the plaintiff's claims, *id.* at 556, "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable,'" *Watts,* 495 F.3d at 1295 (quoting *Twombly,* 550 U.S. at 556).

FACTUAL ALLEGATIONS

Accepting the allegations in Lyttle's Complaint (ECF No. 1) as true and construing all reasonable inferences in his favor as required at this stage of the proceedings, *Iqbal*, 129 S. Ct. at

1949, the Court finds that Lyttle has alleged the following facts.[6]

Lyttle is a thirty-four-year-old U.S. citizen of Puerto Rican descent.  He was born in North Carolina.  Compl. Ex. A, Certificate of Live Birth, ECF No. 1-1.  Lyttle was adopted in 1985, Compl. Ex. B., Final Judgment of Adoption, ECF No. 1-2, and raised primarily in North Carolina.  Lyttle did not receive a high school education and is barely literate.  He suffers from mental disabilities, including cognitive disorders, and has spent time in psychiatric hospitals.  He has difficulty with conceptualization, memory, and visual processing, and he has a diminished capacity to comprehend everyday events.  Lyttle has also been diagnosed with bipolar disorder and takes medication to control this disorder and the seizures associated with it.

I.   **Lyttle's Arrest and Detention in North Carolina**

In 2008, Lyttle was being treated at Cherry Hospital, a state psychiatric hospital in Goldsboro, North Carolina.  During treatment, Lyttle was charged with inappropriately touching a female orderly and arrested for misdemeanor assault.  Lyttle was sentenced to 100 days at Neuse Correctional Institution in North

---

[6] Throughout this Order, the Court states that various Defendants engaged in specific conduct that is offensive to the Constitution. The Court emphasizes that such conduct is only alleged to have occurred, and as the action proceeds, Plaintiff must ultimately prove these allegations.

Carolina.   Lyttle  began  serving  his  sentence  on  August  22,  2008,
and  he  was  housed  in  the  mental  health  ward.

On  September  2,  2008,  North  Carolina  ICE  agents  Robert
Kendall  and  Dashanta  Faucette  took  Lyttle  into  custody  from  the
North  Carolina  Department  of  Corrections  and  interrogated  him
without  a  witness  present.   The  agents  were  aware  of  Lyttle's
mental  disorders.    Faucette's  interview  notes  state  that
Lyttle's  name  was  presumed  to  be  Jose  Thomas  and  the  name  Mark
Daniel  Lyttle  was  an  alias.    She  further  noted  Lyttle  was  a
citizen  of  Mexico  who  entered  the  United  States  at  age  three
without  permission.    The  notes  state  his  home  address  as  an
assisted  living  facility  in  Elizabeth  City,  North  Carolina.
After  the  interview,  the  agents  instructed  Lyttle  to  sign  his
name  on  the  notes  form  without  permitting  him  to  review  the
contents  of  the  notes  or  disclosing  the  contents  to  him.   Lyttle
signed  his  real  name,  Mark  Lyttle.   On  a  separate  form,  Faucette
wrote  that  Lyttle's  mother  was  from  Kentucky.   In  the  category
asking  for  details  regarding  whether  Lyttle  was  eligible  for  a
special  status  program,  she  wrote  "Mental  Illness"  and
"Bipolar."   Compl.  ¶  43,  ECF  No.  1.

ICE  agents  then  conducted  a  search  of  the  U.S.  Department
of  Justice  Federal  Bureau  of  Investigation  Criminal  Justice
Information  Services  Division  and  other  databases.   The  searches
revealed  records  showing  Lyttle  was  a  U.S.  citizen  with  a  valid

Social Security number.  The records made no reference to the name Jose Thomas.

On September 5, 2008, ICE agent Dean Caputo signed a Warrant for Arrest of Alien ("Warrant") authorizing any officer to take Lyttle into custody and process him for removal as an alien in the country in violation of the immigration laws. Caputo also signed a Notice of Intent to Issue Final Administrative Removal Order ("Notice of Intent").  The Notice of Intent stated that it had been determined Lyttle was a not a U.S. citizen but rather a native of Mexico and deemed him deportable pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii) as an "alien who is convicted of an aggravated felony."  Compl. ¶¶ 46-47.  Caputo then signed a Notice of Custody Determination placing Lyttle in the custody of the Department of Homeland Security ("DHS") pending a final determination by an immigration judge.  Kendall notified the North Carolina Department of Corrections that Lyttle must remain in custody after his criminal sentence because he was deportable.  The Notice of Intent and Warrant were served on Lyttle on September 8, 2008.

Lyttle alleges that Faucette coerced and manipulated Lyttle into signing the Notice of Intent.  By signing, Lyttle waived his legal right to a removal hearing before an immigration judge, falsely acknowledged he was a Mexican citizen, and agreed to be deported to Mexico.  He did not understand the document or

the implications of signing it.  No one assisted Lyttle in reading or understanding the document.  Faucette also allegedly coerced Lyttle to sign an acknowledgement of the Notice of Custody Determination.  The acknowledgement identified Lyttle as Jose Thomas, but Lyttle signed his name as Mark Lyttle.

## II.  Lyttle's Detention in Georgia Awaiting Removal

The North Carolina Department of Corrections was scheduled to release Lyttle at the end of his criminal sentence on October 26, 2008.  On October 28, 2008, however, Lyttle's detention was continued, and he was transferred into ICE custody in North Carolina.  He was then transported to the Stewart Detention Center ("SDC") in Lumpkin, Georgia.  ICE Detention and Removal Operations and Corrections Corporation of America operate SDC.

### A.   Interrogation and Recommendation

ICE agent David Collado interrogated Lyttle on November 3, 2008 and recorded Lyttle's responses on a Record of Sworn Statement in Affidavit Form.  During the interrogation, Lyttle stated unequivocally that he was a U.S. citizen born in North Carolina and "repeatedly denied being a Mexican citizen." Compl. ¶ 58.  Despite Lyttle's answers, Collado attached an un-served Notice of Intent to Issue Final Administrative Removal Order to the interrogation form stating Lyttle was deportable because of his criminal convictions.

On November 5, 2008, Collado filled out an I-213 Record of Deportable/Inadmissible Alien, noting that Lyttle had "a bipolar mental illness condition." *Id.* ¶ 60.  Lyttle did not review or receive a copy of this form.  Because Lyttle claimed U.S. citizenship, Collado recommended Lyttle be referred for a removal hearing before an immigration judge.  That same day, ICE agent Tracy Moten issued Lyttle a Notice to Appear at removal proceedings.  The Notice to Appear falsely alleged that Lyttle was not a U.S. citizen or national.  Rather, it alleged he was a citizen of Mexico, even though Lyttle had affirmatively claimed he was a U.S. citizen and there was a complete lack of independent evidence supporting the allegation that he was a citizen of Mexico.  *Id.* ¶ 62.

B.    The Hayes Memo

On February 13, 2008, the U.S. House of Representatives Judiciary Committee sponsored a hearing on ICE procedures related to the deportation of U.S. citizens.  On November 6, 2008, James Hayes, Director of the Office of Detention and Removal Operations ("DRO"), issued a memorandum ("Hayes Memo") to all ICE Field Office Directors regarding reporting and investigating claims of U.S. citizenship.  *Id.* ¶ 63; Reply Mem. in Supp. of U.S.' &Official Capacity Defs.' Mot. to Dismiss Ex.

M, Mem. from James T. Hayes, Jr. to Field Office Directors (Nov. 6, 2008), ECF No. 64-1 [hereinafter Hayes Memo].[7]

The Hayes Memo set forth notification guidelines for ICE "officers who encounter an individual who they have reason to believe is in the United States in violation of law . . . but who claims U.S. citizenship." Hayes Memo 1. The Field Office Director "shall make the appropriate notification to DRO headquarters . . . [and] ensure that all affirmative claims to U.S. citizenship made by any individual encountered within their area of responsibility are appropriately reported and investigated." *Id.* at 1-2. The Memo further requires that interviews of detainees claiming citizenship be recorded as sworn statements, include questions needed to complete Form I-213, and include questions to garner information for a full investigation of the individual's citizenship. *Id.* at 2. The "investigation may include vital records searches, family interviews, and other appropriate investigative measures." *Id*.

The Hayes Memo provides that where the detainee claims U.S. citizenship before formal removal proceedings, the Field Office Director must consult with the DRO, and the local Office of Chief Counsel to "determine whether sufficient evidence exists

---

[7] On November 19, 2009, after the events giving rise to this action, DHS Assistant Secretary John Morton issued a memorandum superseding the Hayes Memo and stating that, "In all cases, any uncertainty about whether the evidence is probative of U.S. citizenship should weigh against detention." Compl. ¶ 74.

to place that individual into removal proceedings." *Id.* A claim of citizenship following a Notice to Appear requires consultation between the Field Office Director and Office of Chief Counsel, and if necessary the Office of DRO, to determine the proper course of action. *Id.* Field Office Directors "shall ensure that all DRO employees in their area of responsibility . . . understand and adhere to this policy." *Id.*

### C. Lyttle's Detention After Issuance of the Hayes Memo

ICE agent Marco Mondragon interrogated Lyttle on November 12, 2008. He recorded Lyttle's sworn responses on a Record of Sworn Statement in Affidavit Form. During the interrogation, Lyttle told Mondragon he was a U.S. citizen. Mondragon disregarded Lyttle's claim of citizenship, ignored the independent evidence of Lyttle's U.S. citizenship, and failed to consider Lyttle's obvious mental disabilities and how they affected his ability to comprehend the gravity of the situation. Mondragon also "struck through" some of Lyttle's answers and replaced them with different answers, "creating a conflicting, inconsistent and factually inaccurate record." Compl. ¶ 76. Lyttle alleges that Mondragon ultimately coerced and manipulated Lyttle into signing an affidavit that falsely stated his name was Jose Thomas and that his father was a Mexican citizen also named Jose Thomas. *Id.* ¶¶ 76-78.

While in custody, Lyttle required Glucophage, a daily diabetic medication. On November 17, 2008, Lyttle ingested sixty Glucophage pills in a suicide attempt. He was rushed to the Emergency Room at Doctors Hospital in Columbus, Georgia. The hospital treated him for toxic drug overdose, held and monitored him for several days, and then returned him to SDC.[8]

### III. Lyttle's Removal from the United States

On December 9, 2008, Immigration Judge Cassidy ("the IJ") ordered that Lyttle be removed to Mexico. At the hearing before the IJ, Lyttle did not have an opportunity to present evidence or challenge the evidence of Mexican citizenship brought against him. Despite Lyttle's mental disabilities, the IJ did not assess whether Lyttle was competent to proceed unrepresented in his removal proceedings or waive his right to counsel. The IJ did not determine whether safeguards were necessary to ensure Lyttle received a fair hearing. Construing these allegations in Lyttle's favor, it is reasonable to infer that the IJ simply rubber-stamped the false conclusion and unsupported record constructed by North Carolina ICE and the Georgia ICE Defendants that stated Lyttle was a citizen of Mexico.

---

[8] The facts surrounding Lyttle's attempted suicide and the SDC's dispensation of his diabetic medication are not relevant to the pending motions addressed in this Order. These facts give rise to Lyttle's claim 8, which is subject to the United States and official capacity Defendants' motion for summary judgment (ECF No. 47), which the Court deferred ruling on until after it rules on the motions to dismiss. Minute Entry, Oct. 14, 2011, ECF No. 70.

After the IJ's order and prior to Lyttle's deportation, on December 12, 2008, "Defendant ICE Field Office Director Raymond Simonse or an ICE Doe Defendant performed an additional criminal background search of Mr. Lyttle's state records from North Carolina and Virginia, and pulled electronic records from various federal agencies." Compl. ¶ 92. This search was the first such search in the record conducted by any Georgia ICE officer. This search revealed numerous references to Lyttle's U.S. citizenship and Social Security number. Notwithstanding this evidence of Lyttle's U.S. citizenship and with no additional follow-up or referral to one of his superiors, three days later, Simonse issued a Warrant of Removal/Deportation that declared Lyttle removable by order of an immigration judge.

ICE personnel put Lyttle on a plane to Hidalgo, Texas on December 18, 2008. "When the plane touched down, Mr. Lyttle was transported to the Mexican border, forced to disembark and sent off on foot into Mexico, still wearing the prison-issued jumpsuit from [SDC]." *Id.* ¶ 101. Lyttle did not speak Spanish, was unfamiliar with Mexico, and had only three dollars.

Eight days later, Lyttle attempted to cross back into the United States at the Hidalgo, Texas border crossing. The Customs and Border Patrol agents at Hidalgo detained Lyttle. Lyttle informed the agents he was a U.S. citizen from North Carolina. The agents then interrogated him in Spanish. Because

16

he did not speak Spanish, Lyttle did not respond to the questioning. The agents found a computerized record of Lyttle's deportation and described Lyttle as a "prior deported alien." *Id.* ¶ 108. They determined he would be processed for removal and "returned to Mexico in the custody of Mexican Immigration." *Id.* Lyttle never received a copy of the expedited removal form, did not have an opportunity to review the form or have it read to him, and did not have an immigration judge review his status at that time. The agents turned Lyttle over to Mexican Immigration.

Over the next 115 days, Lyttle wandered through Central America. In Mexico, missionaries picked him up, arranged for his transport to Mexico City, and told him to find the U.S. Embassy. Mexican Immigration officials arrested Lyttle in Mexico City and placed him on a bus in handcuffs for deportation to Honduras because he could not prove Mexican citizenship.

Honduran Immigration officials arrested Lyttle and placed him in an immigration camp. He was ultimately transferred from the camp to a criminal jail, "where he suffered severe physical and mental abuse by the guards of the prison." *Id.* ¶ 113. After public pressure and a media campaign exposing the harsh treatment of Lyttle, he was released from the Honduran jail.

Lyttle was later incarcerated in Nicaragua because he could not produce evidence of his citizenship or identity. Finally,

Lyttle arrived in Guatemala and located the U.S. Embassy in Guatemala City. An employee at the embassy used the names of Lyttle's brothers and his birthplace to locate Lyttle's brothers, who serve in the U.S. military. The employee arranged for copies of Lyttle's adoption records to be sent to the embassy and then printed and issued him a U.S. passport within twenty-four hours.

## IV.  Lyttle's Return to the United States

Lyttle's family wired him funds and purchased him an airplane ticket to the United States. On April 22, 2009, Lyttle boarded a plane for Nashville, Tennessee. On his way to Tennessee, Lyttle landed in Atlanta, Georgia. As Lyttle passed through customs in Atlanta, ICE agents Charles Johnston and Brian Keys detained and interrogated Lyttle based on a record search that identified Lyttle as an alien with "a lengthy criminal history." *Id.* ¶ 119.

Lyttle claimed U.S. citizenship to Johnston and Keys and told the story of his deportation in Central America. The agents documented Lyttle's claims. Johnston discredited Lyttle's passport and found him inadmissible without the proper papers to be admitted into the United States. Copies of Lyttle's adoption and passport were faxed to the agents. The next day, without verifying Lyttle's claims of U.S. citizenship, attempting to locate family, or substantiating the validity of

the adoption papers or passport issued by the U.S. Embassy in Guatemala, ICE agents Johnston and Keys issued an expedited removal order against Lyttle.  The Notice and Order of Expedited Removal alleged Lyttle was not a U.S. citizen but rather a native and citizen of Mexico.  Further, it stated, "Lyttle falsely presented himself as a U.S. citizen by using the passport issued by the U.S. Embassy in Guatemala." *Id.* ¶ 126.

Lyttle was detained in Atlanta.  His family, expecting him to arrive in Tennessee, hired an attorney who located Lyttle and demanded his release.  On April 24, 2009, ICE released Lyttle.

On April 28, 2009, DHS filed a motion to terminate the deportation efforts on the basis that "it was determined that [Lyttle] was not a Mexican citizen and is, in fact, a citizen of the United States."  Compl. Ex. C, Department of Homeland Security's Mot. to Terminate Proceedings ¶ 4, ECF No. 1-3 [hereinafter DHS Mot.].  DHS' motion was granted.  "Lyttle suffered and continues to suffer grievous physical and psychological injury" from his deportation.  Compl. ¶ 130.

## V.   The North Carolina Action

Lyttle filed an action in the United States District Court for the Eastern District of North Carolina asserting causes of action similar to the ones asserted in this action based on the conduct of ICE employees that occurred in North Carolina.  *See Lyttle v. United States*, No. 4:10-CV-142-D (E.D.N.C).  While the

claims overlap somewhat, the acts giving rise to the present action in this Court relate to the conduct that occurred after ICE transferred Lyttle from North Carolina to Georgia.

DISCUSSION

The Court divides this Discussion into two sections. In section I, the Court addresses Lyttle's constitutional *Bivens* claims against the ICE Defendants in their individual capacities. In section II, the Court addresses Lyttle's official capacity claims for injunctive relief and Lyttle's tort claims for monetary damages against the United States under the FTCA.

## I.   Lyttle's *Bivens* Claims Against the ICE Defendants in Their Individual Capacities

To avoid dismissal of his claims against the ICE Defendants in their individual capacities, Lyttle must have sufficiently alleged facts demonstrating a constitutional violation, facts showing that the ICE Defendants are not protected by qualified immunity, and facts that support the availability of a damages remedy for the alleged constitutional violations. Lyttle seeks monetary damages pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) based on the alleged     violation of his constitutional rights by the ICE Defendants when they detained him and caused his unlawful removal from the United States. Lyttle maintains that by detaining him, a United States citizen,

and causing his removal without reasonable basis or authority, the ICE Defendants (1) deprived Lyttle of his right to liberty without due process of law in violation of the Fifth Amendment; (2) unreasonably seized him in violation of the Fourth Amendment; and (3) discriminated against him based on his race and/or ethnicity in violation of the Fifth Amendment. Defendants respond that Lyttle's claims should be dismissed because: (1) they are not cognizable under *Bivens;* (2) even if they are permitted under *Bivens,* they fail to state claims for a constitutional violation; and (3) if they are cognizable under *Bivens* and do state a constitutional violation, Defendants are entitled to qualified immunity. The Court first analyzes the nature of the alleged constitutional violations to determine whether a claim for monetary damages against the responsible government agents should be allowed under the *Bivens* rationale.[9]

A.   *Bivens* Analysis

In *Bivens*, the Supreme Court held that a violation of the Fourth Amendment's prohibition against unreasonable search and seizure by a federal agent acting under color of his authority gives rise to a cause of action for damages caused by his unconstitutional conduct. 403 U.S. at 389-90, 397. The Supreme

---

[9] The Court's *Bivens* analysis does not include an examination of Lyttle's discrimination claim because the Court finds that Lyttle has failed to state sufficient facts to state a plausible claim for discrimination. *See infra,* DISCUSSION I.B.2. Therefore, it is unnecessary to determine whether such a claim would be actionable under *Bivens.*

Court explained that the cause of action in *Bivens* was an implied one because no statute or other provision of law provided a meaningful remedy for the constitutional violation. *Id.* at 397; *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001).  A cause of action, however, does not exist for every constitutional violation by a federal agent.  The Supreme Court has been careful to circumscribe the types of constitutional violations that may be vindicated through *Bivens*.  In addition to the remedy for Fourth Amendment violations established in *Bivens*, the Supreme Court has only expressly recognized two other non-statutory damages remedies: a remedy for employment discrimination in violation of the Fifth Amendment's Due Process Clause and a remedy for an Eighth Amendment violation by prison officials.  *Wilkie v. Robbins,* 551 U.S. 537, 549-50 (2007) (citing *Davis v. Passman,* 442 U.S. 228 (1979) and *Carlson v. Green,* 446 U.S. 14 (1980)); *accord Minneci v. Pollard*, 132 S. Ct. 617, 622 (2012) (confirming that since *Carlson,* the Supreme Court has declined to recognize any new *Bivens* actions).  The Supreme Court has expressly rejected a *Bivens* remedy for the following claims: First Amendment violations by federal employers, *Bush v. Lucas,* 462 U.S. 367, 386-88, 390 (1983); harm to military personnel through activity incident to service, *United States v. Stanley,* 483 U.S. 669, 683-84 (1987) and *Chappell v. Wallace*, 462 U.S. 296, 298-300, 305 (1983); denials

of Social Security disability benefits in violation of the Fifth Amendment, *Schweiker v. Chilicky,* 487 U.S. 412, 414 (1988); and harassment and intimidation to obtain property rights, *Wilkie,* 551 U.S. at 562. In its most recent *Bivens* case, the Supreme Court stated: "Although the Court, in reaching its decisions, has not always similarly emphasized the same aspects of the cases, *Wilkie* fairly summarizes the basic considerations that underlie those decisions." *Minneci*, 132 S. Ct. at 623 (citing *Wilkie*, 551 U.S. at 550).

In *Wilkie,* the Supreme Court explained that "any free-standing damages remedy for a claimed constitutional violation has to represent a judgment about the best way to implement a constitutional guarantee; it is not an automatic entitlement no matter what other means there may be to vindicate a protected interest." 551 U.S. at 550. The Supreme Court has set forth a two-step inquiry for determining whether to recognize a *Bivens* remedy when federal employees violate a constitutionally recognized interest. First, the Court should consider "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Id.* (citing *Bush,* 462 U.S. at 378)*.* Second, even if no alternative remedy exists, "'the federal courts must make the kind of remedial determination that is appropriate for a common-

law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation.'"  *Id.* (quoting *Bush,* 462 U.S. at 378).  The Eleventh Circuit applies this two-step inquiry.  *Hardison v. Cohen*, 375 F.3d 1262, 1264 (11th Cir. 2004).

The Court must therefore determine whether Lyttle's alleged Fourth Amendment unreasonable seizure and Fifth Amendment due process violations are the types of constitutional violations that may be vindicated through *Bivens*.  To make that determination, the Court first evaluates whether an alternative process exists to protect these rights in a meaningful way.  The Court then considers whether special factors exist that counsel hesitation in the establishment of a remedy for these alleged violations.

Defendants argue that no *Bivens* remedy should be created for Lyttle's constitutional claims for two reasons: (1) the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, provides a comprehensive statutory scheme including remedies, thus, precluding a *Bivens* remedy; and (2) the political branch has plenary power over immigration, which is a special factor counseling hesitation that precludes a *Bivens* remedy.  The Court addresses each issue in turn.

1.   *Existence of an Adequate Alternative Remedy*

"'When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, [the Supreme Court has] not created additional *Bivens* remedies.'"   *Hardison*, 375 F.3d at 1264 (quoting *Schweiker*, 487 U.S. at 423).   But an alternative remedy must be "clearly constitutionally adequate" for it to preclude additional remedies under *Bivens*.   *Bush*, 462 U.S. at 378 n.14.   Congress enacted the INA as a comprehensive scheme to regulate "'immigration and naturalization'" and set "'the terms and conditions of admission to the country and the subsequent treatment of *aliens* lawfully in the country.'"   *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, 1973 (2011) (quoting *De Canas v. Bica*, 424 U.S. 351, 353, 359 (1976)) (emphasis added). Defendants ignore the fact that the INA provides an administrative process for the deportation and immigration of *aliens* who are not constitutionally or statutorily permitted to remain in the United States.   *See, e.g.*, 8 U.S.C. § 1103(a)(1). Nothing in the INA addresses a meaningful remedy for a *United States citizen* who is wrongfully detained under the auspices of the Act and then banished from the country without justification.   *See* 8 U.S.C. § 1101(a)(3) ("The term 'alien' means any person not a citizen or national of the United

States."). The remedy under the INA is not constitutionally adequate for citizens. Accordingly, the scheme in place is not sufficiently comprehensive because it does not provide "meaningful safeguards or remedies" for a U.S. citizen like Lyttle. *Schweiker*, 487 U.S. at 425.

The Court finds those cases that hold that the INA is sufficiently comprehensive and adequate to preclude *Bivens* claims for persons who are *not* citizens of the United States to be inapposite. *See, e.g.*, *Mirmehdi v. United States*, 662 F.3d 1073, 1080 (9th Cir. 2011) (refusing to extend *Bivens* to aliens alleging invalid detention during immigration proceedings because of the complex, comprehensive INA remedial system and factors counseling hesitation in the immigration context); *Arar v. Ashcroft*, 585 F.3d 559, 573-74 (2d Cir. 2009) (stating that it was difficult in the context presented to determine if the INA provided an alternative remedial scheme, but declining to extend *Bivens* to the context of extraordinary rendition of an alien because of special factors counseling hesitation); *Papa v. United States*, 281 F.3d 1004, 1011 (9th Cir. 2002) (holding that an alien's *Bivens* claims for unreasonable search and seizure and discrimination upon entry were properly dismissed because "[a]liens are not afforded due process protections when they seek admission to the United States."); *D'Alessandro v. Chertoff*, No. 10-CV-927A, 2011 WL 6148756, at *4 (Dec. 12, 2011

W.D.N.Y.) (applying *Mirmehdi* to deny *Bivens* relief for improper detention claims by a legal permanent resident of the United States). The persuasiveness of the rationale underlying these cases weakens considerably when extended to a citizen of the United States instead of an alien. Neither the holdings in these cases nor their constitutional basis apply to *U.S. citizens* wrongfully subjected to the removal procedures of the immigration system that lack sufficient constitutional safeguards for U.S. citizens. Defendants fail to recognize this important distinction between aliens and citizens—a distinction that is well recognized in the case law. "It is well established that immigrants' remedies for vindicating the rights which they possess under the Constitution are not coextensive with those offered citizens." *Mirmehdi*, 662 F.3d at 1079 (citing, *e.g., Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 488 (1999)); *see, e.g., Adras v. Nelson*, 917 F.2d 1552, 1555 (11th Cir. 1990) ("[A]liens have no constitutional rights with regard to their applications [for entry into the United States] and must be content to accept whatever statutory rights and privileges they are granted by Congress.") (internal quotation marks omitted).

The distinction between the constitutional protections available to a citizen compared to a non-citizen when each faces

removal from the United States has long been recognized by the Supreme Court:

> The order of deportation is not a punishment for crime. It is not a banishment, in the sense in which that word is often applied to the expulsion of a citizen from his country by way of punishment. It is but a method of enforcing the return to his own country of an alien who has not complied with the conditions upon the performance of which the government of the nation, acting within its constitutional authority, and through the proper departments, has determined that his continuing to reside here shall depend. He has not, therefore, been deprived of life, liberty, or property without due process of law; and the provisions of the constitution, securing the right of trial by jury, and prohibiting unreasonable searches and seizures and cruel and unusual punishments, have no application.

*Fong Yue Ting v. United States*, 149 U.S. 698, 730 (1893).  On the other hand, it logically follows that when a *citizen* is removed, the United States cannot rely upon the "diminished constitutional rights" theory because a citizen does not give up the full panoply of rights available to him just because the government mistakenly determines that he is an alien.  It is certainly not a startling proposition to suggest that if the government or its officer mistakenly treats a citizen as a non-citizen and does not afford the citizen the rights to which he is entitled, it does so at the peril of violating the citizen's constitutional rights.  It would be a startling proposition to suggest that a person's constitutional rights depend upon

whether a government official identifies the person as a citizen or an alien regardless of whether their designation is accurate.

The Court does not imply that the INA provides no procedural protections for citizens who may be wrongly identified as deportable aliens. *See e.g.* 8 U.S.C. § 1252(b)(5) (providing a procedure for review of a petitioner's claim of U.S. nationality following issuance of a final order of removal). However, the Court finds these protections are constitutionally inadequate to avoid the wrongful detention and removal of a United States citizen and to remedy such constitutional violations after they have occurred. There is scant evidence that Congress gave any thought to what the remedy should be for a citizen who is wrongly detained and deported. The INA scheme as applied to U.S. citizens is in stark contrast to the comprehensive programs precluding *Bivens* remedies for plaintiffs in other cases. *See Schweiker*, 487 U.S. at 429 (finding no *Bivens* remedy because Congress "has addressed the problems created by state agencies' wrongful termination of disability benefits," and "Congress is the body charged with . . . the design of a massive and complex welfare benefits program"); *Bush*, 462 U.S. at 386, 390 (declining to extend *Bivens* where the civil service statute "provides meaningful remedies for employees who may have been unfairly disciplined for making critical comments about their agencies" because the

Supreme Court was "convinced that Congress is in a better position to decide whether or not the public interest would be served by creating [a new legal liability]"). The Court concludes that the INA does not provide any meaningful remedy and review procedure for Lyttle, a U.S. citizen, in this case. Where, as here, there is no congressionally created remedy for the Constitutional violations Lyttle suffered and Congress has not explicitly declared an alternative remedy to be a substitute for recovery, the Court may craft a remedy so long as no factors counseling hesitation demand that the Court refrain from doing so. *Wilkie*, 551 U.S. at 550; *accord Carlson*, 446 U.S. at 18-19.

### 2. *Factors Counseling Hesitation*

The only factor that Defendants assert as counseling hesitation is that the political branch has plenary power over immigration. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977); *Fong Yue Ting*, 149 U.S. at 731. The Court does not quarrel with this general observation. Defendants' argument, however, again fails to make the distinction between the use of the immigration process to regulate the admission and removal of *aliens*, a legitimate exercise of the power of the political branch of government, and the use of that process to detain and remove *citizens*, an unauthorized exercise of political branch power unless additional constitutional protections are provided to safeguard against the wrongful removal of a citizen from his own

country.    The   Court   rejects   Defendants'   arguments   that
sufficient   factors   exist   counseling   that   the   Court   resist
finding   a   *Bivens*   remedy   in   this   context—the   wrongful   detention
and   removal   of   a   citizen   from   the   United   States.

The   Court   emphasizes   that   today's   ruling   is   a   narrow   one.
Specifically,   the   Court   holds   that   a   *United   States   citizen*   with
a   diminished   mental   capacity   who   has   been   detained   without
probable   cause,   who   the   federal   agents   know   claims   to   be   a   U.S.
citizen,   whose   claim   of   citizenship   is   not   investigated,   whose
claim   is   supported   by   easily   accessible   corroborating   evidence,
and   who   is   manipulated   by   the   federal   agents   through   coercion
and   distortion   of   the   record,   should   have   a   claim   against   the
responsible   agents   to   recover   damages   for   his   injuries   caused   by
his   detention   and   subsequent   banishment   from   the   United   States,
if   he   is   able   to   prove   that   the   government   employee   violated   his
constitutional   rights   in   the   process   and   if   that   employee   is   not
entitled   to   qualified   immunity.    Accordingly,   the   Court   finds
that   Lyttle's   Fourth   Amendment   seizure   claim   and   his   Fifth
Amendment   due   process   claim   for   monetary   damages   against   the
individual   ICE   Defendants   shall   not   be   dismissed   as   disallowed
under   *Bivens*.

### B.   Failure to State a Claim and Qualified Immunity

#### 1.   *Fourth and Fifth Amendment Claims*

Deciding that a *Bivens* remedy is available for Lyttle's Fourth Amendment unreasonable seizure claim and Fifth Amendment due process claim is not dispositive of Defendants' motion to dismiss.  In a *Bivens* action, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Keating v. City of Miami*, 598 F.3d 753, 763 (11th Cir. 2010) (internal quotation marks omitted).[10]   To this end, "a plaintiff must allege some factual detail as the basis" for a claim.  *Id.* Therefore, the Court must examine the alleged conduct of each individual Defendant against whom Lyttle seeks monetary damages and determine whether Lyttle's allegations support a constitutional violation, and if they do, whether the Defendants are nevertheless entitled to qualified immunity.  *Butz v. Economou*, 438 U.S. 478, 505-07 (1978).

Lyttle alleges that the conduct of the individual ICE Defendants, individually and in combination, violated his right

---

[10] While *Keating* involved a § 1983 action and the case before the Court is a *Bivens* action, "the difference is inconsequential.  Both deal with an unconstitutional deprivation of rights which the Supreme Court compares on equal footing. . . ."  *Randall v. Scott*, 610 F.3d 701, 708 n.3 (11th Cir. 2010) (citing *Iqbal*, 129 S. Ct. at 1949).  "[I]t would be untenable to draw a distinction for purposes of immunity law between suits brought against state officials under . . . . § 1983 and suits brought directly under the Constitution against federal officials."  *Harlow v. Fitzgerald*, 457 U.S. 800, 809 (1982) (internal quotation marks omitted).

not to be subjected to unreasonable seizure under the Fourth Amendment and his right not to be deprived of his liberty without due process of law under the Fifth Amendment. He contends that by detaining him without probable cause and being consciously indifferent to evidence of his U.S. citizenship, the ICE Defendants violated his Fourth and Fifth Amendment rights. His Fourth Amendment rights were allegedly violated based on the administrative decisions by the ICE Defendants to detain him without probable cause. His Fifth Amendment rights were allegedly violated based on the ICE Defendants' continued detention of him after discovering evidence indicating that they had no probable cause to continue the detention. Lyttle also alleges that by removing him from the United States without probable cause to believe he was an alien and with a conscious indifference to the evidence demonstrating that he was a U.S. citizen, the ICE Defendants who engaged in this conduct violated his rights under the Fifth Amendment.

Even if the Court finds that Lyttle has sufficiently alleged a constitutional violation against an individual ICE Defendant, that Defendant can only be held legally responsible for the violation if the Court also finds the Defendant is not entitled to qualified immunity. Qualified immunity protects public officers acting within the scope of their discretionary authority from liability if their acts do not violate clearly

established law.   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Rehberg v. Paulk*, 611 F.3d 828, 838 (11th Cir. 2010). "A government agent is entitled to immunity unless his act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." *Rehberg*, 611 F.3d at 838 (internal quotation marks omitted).   In other words, courts "generally accord . . . official conduct a presumption of legitimacy." *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003) (alteration in original) (internal quotation marks omitted).

To establish qualified immunity, the official must first establish he was acting in the scope of his discretionary authority when performing the acts a plaintiff complains of. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).   Here, Lyttle does not dispute that the ICE Defendants were acting within the scope of their discretionary authority.   The record demonstrates that all ICE Defendants were engaged in activities within their job responsibilities during the events at issue.   *See id.* at 1265 (stating that in the qualified immunity context, "discretionary function" means whether the acts at issue "are of a type that fell within the [official's] job responsibilities.").   Accordingly, Lyttle has

the burden "to show that the defendant[s are] *not* entitled to qualified immunity." *Id.* at 1264.

The Court undertakes a two-part analysis to evaluate qualified immunity: "whether (1) the plaintiff has alleged a violation of a constitutional right; and (2) whether the right was 'clearly established' at the time of the defendant's misconduct." *Rehberg*, 611 F.3d at 838-39. "This two-pronged analysis may be done in whatever order is deemed most appropriate for the case." *Id.* at 839 (citing *Pearson v. Callahan*, 555 U.S. 223, 242, (2009)). "To deny their qualified-immunity defenses, the law [at the time of the alleged conduct] must have been sufficiently clear to put [Defendants] on notice that their conduct violated [Lyttle's rights]." *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011). The Eleventh Circuit "uses two methods to determine whether a reasonable officer would know his conduct is unconstitutional." *Id.* (internal quotation marks omitted). One method "looks at the relevant case law at the time of the violation" to determine if the case law "make[s] it obvious to a reasonable government actor that his actions violate federal law." *Id.* (internal quotation marks omitted). The second method looks "at the officer's conduct, and inquires whether that conduct lies so obviously at the very core of what the [Constitution] prohibits that the unlawfulness of the conduct was readily apparent to

[the officer], notwithstanding the lack of fact-specific case law." *Id.* (second alteration in original) (internal quotation marks omitted).

In deciding whether Lyttle's claims may proceed against the individual ICE Defendants, the Court must examine the factual allegations pertaining to the conduct of each Defendant to determine whether that conduct violates the Fourth and/or Fifth Amendments. If so, the Court must determine whether it was clearly established at the time of the alleged violation that such conduct would violate those constitutional provisions.

Under the Fourth Amendment, Lyttle has a constitutional right to be free from unreasonable seizures. U.S. Const. amend. IV. A seizure occurs when "a person's freedom of movement is restrained by means of physical force or by submission to a show of authority," which includes an arrest or detention. *United States v. Allen*, 447 F. App'x 118, 120 (11th Cir. 2011) (per curiam). An arrest, a complete seizure, must be supported by probable cause. *United States v. Blackley*, 439 F. App'x 803, 805 (11th Cir. 2011) (per curiam). "It is settled law that warrantless searches [and seizures] require the same investigative basis in fact or reasonable conjecture as searches

[and seizures] under warrant." *United States v. Brennan*, 538 F.2d 711, 720 (5th Cir. 1976).[11]

An officer may arrest "any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any [immigration] law or regulation." 8 U.S.C. § 1357(a)(2); *see also* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States.").[12] Officers may inquire about an individual's citizenship and immigration status, but the officer must have probable cause or consent to detain the individual. *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975). "[A]n arrest or [detention] without probable cause violates the Fourth Amendment," and is thus an unconstitutional seizure. *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998). "[T]he probable cause standard for pretrial detention is the same as that for an arrest." *Baker v. McCollan*, 443 U.S. 137, 143 (1979).

---

[11] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[12] The Eleventh Circuit and other circuits have construed 8 U.S.C. § 1357(a)'s "reason to believe" standard as equivalent to probable cause. *E.g.*, *Brennan*, 538 F.2d at 719; *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975); *Au Yi Lau v. U.S. Immigration & Naturalization Serv.*, 445 F.2d 217, 222 (D.C. Cir. 1971).

"Under federal law, probable cause to arrest exists when an arrest is objectively reasonable based on the totality of the circumstances." *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003). "This standard is met when the facts and circumstances within the *officer's knowledge,* of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* (internal quotation marks omitted). To seize and detain a person for being an illegal alien, an officer must have probable cause to believe that the individual is an illegal alien. *Cf. Brignoni-Ponce*, 422 U.S. at 884 (stating that the Fourth Amendment "forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens."). "As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Id.* at 878.

Even if no probable cause ultimately exits, officers making an arrest are entitled to qualified immunity so long as "arguable probable cause for the arrest" exists. *Durruthy*, 351 F.3d at 1089 (internal quotation marks omitted). This means that an officer has qualified immunity so long as he "reasonably

could have believed that probable cause existed, in light of the information he possessed." *Id.* (internal quotation marks omitted). "Indeed, 'it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . in such cases those officials . . . should not be held personally liable.'" *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990) (alterations in original) (quoting *Anderson v. Creighton,* 483 U.S. 635, 641 (1987)).

The Court finds that at the time the Defendants arrested and continued Lyttle's detention, the law was clearly established that an arrest without arguable probable cause to believe that Lyttle was an alien in the United States illegally violated the Fourth Amendment. *Id.* It was also clearly established that an ICE officer did not have the authority to detain or deport U.S. citizens. 8 U.S.C. §§ 1226-28, 1231, 1357(a)-(d) (granting ICE agents authority to arrest, detain and deport *aliens*). Applying the qualified immunity test in the context of Lyttle's unlawful immigration detention, the Court "must determine whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest" Lyttle for violation of the immigration laws. *Von Stein*, 904 F.2d at 579.

As previously noted, Lyttle also alleges that Defendants' conduct violated his Fifth Amendment substantive due process rights.  The Fifth Amendment in pertinent part states that no person shall "be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  Lyttle alleges that by continuing his detention without probable cause and ultimately removing him from the United States when no legal basis existed for his removal, Defendants' conduct, individually and jointly, deprived him of his liberty without due process. Defendants respond that they had the authority under the INA to take the actions that they took, but they fail to appreciate the distinction between taking those actions against an alien compared to a U.S. citizen.  "In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 521 (2003) (internal quotation marks omitted).  In asserting this distinction between citizens and aliens, the Supreme Court held that "[d]etention during removal proceedings is a constitutionally permissible part of that process," and specifically held as constitutional the mandatory "INS detention of . . . a criminal alien who has conceded that he is deportable, for the limited period of his removal proceedings."  *Id.* at 531.  In the present case, Lyttle was detained as a criminal alien notwithstanding his U.S.

citizenship and clear and convincing evidence available to certain Defendants indicating his citizenship. He was therefore provided with the rights of a *criminal alien* and not a *United States citizen*.

The question remains as to whether this continued detention gives rise to a substantive due process violation. Generally, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 842 (1998) (alteration in original) (internal quotation marks omitted) (citing *Graham v. Connor,* 490 U.S. 386, 395 (1989)). Thus, to the extent that the detention of Lyttle was prohibited under the Fourth Amendment, the Court would not resort to substantive due process to protect against the unconstitutional detention. *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). However, to the extent that the Fourth Amendment does not cover a continued detention of the nature alleged here, Fifth Amendment substantive due process would be implicated. *See Lewis*, 523 U.S. at 843 ("Substantive due process analysis is therefore inappropriate in this case only if respondents' claim is 'covered by the Fourth Amendment," which "covers only 'searches and seizures.'"). To establish a

41

substantive due process violation, a plaintiff must prove that the defendant "acted with deliberate indifference," meaning the defendant "had (1) subjective knowledge of a risk of serious harm; [and] (2) disregard[ed] . . . that risk; (3) by conduct that is more than mere negligence." *West v. Tillman*, 496 F.3d 1321, 1327 (11th Cir. 2007) (per curiam) (alterations in original) (internal quotation marks omitted).

The Supreme Court in *Baker v. McCollan* held that innocent people may be arrested without a constitutional violation occurring—as long as the arrest meets the standards of the Fourth Amendment.  443 U.S. at 144.  But, the Court qualified that holding by stating that after a period of time continued detention may amount to a Fifth Amendment substantive due process violation.  *Id.* at 144-45.  Thus, even if the initial arrest or detention does not violate the Fourth Amendment, continued detention without probable cause could violate a detainee's Fifth Amendment due process rights.  The Supreme Court further stated that an individual "could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment." *Id.* at 144.  Likewise, the Eleventh Circuit has recognized that due process includes the "right to be free from continued detention after it was or should have been known that the detainee was entitled to

release." *Cannon v. Macon Cnty.*, 1 F.3d 1558, 1563 (11th Cir. 1993), *modified on other grounds,* 15 F.3d 1022 (1994).[13]

The Court finds that whether the violation is asserted under the Fourth Amendment or the Fifth Amendment, the law was clear at the time of the alleged conduct that a U.S. citizen could not lawfully be detained without probable cause to believe the citizen was not a citizen, particularly when confronted with substantial evidence of such citizenship.

Lyttle's Fifth Amendment due process claim extends beyond his detention to his ultimate removal from the United States. In addition to detaining aliens, "[t]he executive may deport certain aliens but has no authority to deport citizens. An assertion of U.S. citizenship is thus a denial of an essential jurisdictional fact in a deportation proceeding." *Rivera v. Ashcroft*, 387 F.3d 835, 843 (9th Cir. 2004) (internal quotation marks omitted), *modified on other grounds,* 394 F.3d 1129 (2005). Deporting one who claims to be a citizen is a deprivation of liberty implicating Fifth Amendment constitutional concerns. *Ng Fung Ho v. White,* 259 U.S. 276, 284-85 (1922). Banishment of a U.S. citizen likewise deprives the citizen "of life, liberty, or

---

[13] Although *Cannon* interpreted the Fourteenth Amendment due process clause, because "the language and policy considerations of the Due Process Clauses of the Fifth and Fourteenth Amendments are virtually identical, decisions interpreting the Fourteenth Amendment's Due Process Clause guide us in determining what due process requires in the Fifth Amendment jurisdictional context." *Fraser v. Smith*, 594 F.3d 842, 849 n.10 (11th Cir. 2010) (internal quotation marks omitted).

property without due process of law." *Fong Yue Ting*, 149 U.S. at 730.  Accordingly, the Court finds that the detention and subsequent removal of a U.S. citizen, like Lyttle, who federal agents know has a diminished mental capacity and who affirmatively claims citizenship, which the federal agents fail to attempt to confirm through readily available corroborating information, implicates Fifth Amendment due process protections. However, to be personally liable, the government agent must have been on notice that his conduct violated clearly established law.

An ICE officer is authorized to arrest and initiate deportation proceedings against persons who are in the United States illegally.  8 U.S.C. §§ 1226, 1231, 1357(a)-(d).  Any ICE officer with this responsibility would know it is illegal and unconstitutional to deport, detain for deportation, or recommend deportation of a U.S. citizen. *See Tuan Anh Nguyen v. U.S. Immigration & Naturalization Serv.*, 533 U.S. 53, 67 (2001) (affirming that a citizen has the "absolute right to enter [the United States] borders"); *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969) ("This Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or

restrict this movement."), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651, 670-71 (1974).   Thus, an ICE officer who actively participates in the detention and/or removal of a person who he knows to be a U.S. citizen, or upon minimal investigation would discover is a U.S. citizen, would be deemed to know that such conduct clearly denies that person liberty without due process of law.   Consequently, any such officer would not be protected by qualified immunity.

The Court next must examine the conduct of each individual ICE Defendant to determine whether that Defendant's conduct violated Lyttle's constitutional rights under the Fourth and Fifth Amendments, which rights were clearly established at the time of the alleged conduct.

a.   DEFENDANTS COLLADO AND MOTEN

Defendant Collado was an ICE enforcement agent who conducted the initial interrogation of Lyttle when he arrived at the SDC in Georgia.   In that interview, Lyttle stated unequivocally that he was a U.S. citizen, provided Collado with his date and place of birth, and repeatedly denied being a Mexican citizen.   Compl. ¶ 58.   Collado was aware that Lyttle suffered from mental illness.   *Id.* ¶ 60.   Lyttle alleges that Collado did not investigate Lyttle's claims of citizenship. Collado attached an un-served Notice of Intent to Issue Final Administrative Removal Order ("Notice of Intent") to his

interrogation form.  The Notice of Intent accurately stated that Lyttle was "a native of United States and a citizen of United States," but paradoxically charged that Lyttle was deportable from the United States because of his criminal convictions.  *Id.* ¶ 59.  Collado then filled out an I-213 Form, Record of Deportable/Inadmissible Alien detailing Lyttle's apprehension by North Carolina ICE.  *Id.* ¶ 60.  Collado never presented Lyttle with a copy of the Form or gave Lyttle an opportunity to review or be apprised of its contents.  *Id.*  Collado determined that, in light of Lyttle's claim that he was a U.S. citizen, an expedited administrative deportation without a hearing was not appropriate and Lyttle should be referred for a hearing before an immigration judge.  *Id.* ¶ 61.

ICE Defendant Moten then issued Lyttle a formal Notice to Appear at removal proceedings before an immigration judge. Notwithstanding Lyttle's assertion of U.S. citizenship to Collado and the alleged "lack of any independent evidence supporting the charge that Mr. Lyttle was a Mexican citizen," the Notice alleged that Lyttle was not a U.S. citizen but was a native of Mexico.  *Id.* ¶ 62.  Lyttle alleges that the actions of Collado and Moten and their failures to investigate Lyttle's claim of citizenship prior to completing the Notice of Intent and the Notice to Appear, charging Lyttle as a deportable alien, directly led to Lyttle's unlawful detention and deportation.

While Collado and Moten did not detain Lyttle indefinitely, Lyttle alleges they did continue his detention despite his repeated protests of citizenship without investigating those claims.  They did so knowing as part of their job that ICE officers have no power under a warrant or without a warrant to arrest and detain a citizen.  8 U.S.C. §§ 1226, 1231, 1357 (granting ICE agents authority to arrest, detain, and deport *aliens*).  Moreover, they knew that a natural and foreseeable consequence of their conduct included the likely removal of Lyttle from the United States.

It is also significant that Collado issued, but never served on Lyttle, a Notice of Intent without a reasonable basis in fact or law for doing so.  A Notice of Intent may be issued by an ICE officer "if the officer is satisfied that there is sufficient evidence, based upon questioning of the alien by an immigration officer and upon any other evidence obtained, to support a finding that the individual: (i) Is an alien . . ."  8 C.F.R. § 1238.1(b)(1).  Collado was faced with the North Carolina ICE record, which included database results showing Lyttle's U.S. citizenship and social security number, and Lyttle's repeated unequivocal claims of citizenship.  By failing to investigate Lyttle's claims beyond the North Carolina ICE record when he was faced with evidence of Lyttle's U.S.

citizenship, Collado knew he risked detaining Lyttle in violation of his rights as a citizen not to be detained.

Moten issued the Notice to Appear to Lyttle based on Collado's interrogation and no independent investigation despite Lyttle's recorded claims of citizenship. A notice to appear can be issued to an alien in removal proceedings. 8 U.S.C. § 1229(a)(1). A notice to appear can be canceled by the issuing officer before jurisdiction vests with the immigration judge "[p]rovided the officer is satisfied that: (1) The respondent is a national of the United States." 8 C.F.R. § 239.2(a)(1). Jurisdiction vests with the immigration judge upon delivering of the charging document to the Immigration Court. 8 C.F.R. § 1003.14(a). After proceedings before the Immigration Court begin, "ICE counsel, or any officer [authorized to issue a notice to appear] may move for dismissal of the matter on the grounds" that the officer is satisfied the respondent is a U.S. national. 8 C.F.R. § 239.2(c). Accordingly, the Court finds that Moten was on notice that he had a duty to use reasonable efforts to ensure that the Notice to Appear was not issued without justification and, thus, did not erroneously serve as the basis for an Immigration Court's determination of deportability, especially in light of Lyttle's claims of U.S. citizenship.

The Court finds that Lyttle has sufficiently alleged a Fourth Amendment violation against Defendants Collado and Moten. Under the totality of the circumstances as alleged, they did not have arguable probable cause to believe that Lyttle was an alien. Their blind reliance upon the North Carolina ICE officers' probable cause determination does not insulate them from liability. Even if they had a reasonable suspicion to question Lyttle about his citizenship based on the North Carolina ICE records and custody transfer, Collado and Moten were still bound by the Fourth Amendment's requirement of probable cause to continue the detention and removal of Lyttle. *Brignoni-Ponce*, 422 U.S. at 881-82. Faced with the North Carolina ICE records, which included search results revealing Lyttle's U.S. citizenship and Social Security number, and Lyttle's assertions of U.S. citizenship during his interrogation with Collado, no reasonable ICE officer on this information alone could find arguable probable cause to detain Lyttle.

Moreover, even though Collado and Moten's conduct occurred before the Hayes Memo provided guidance for ICE investigations of claims of U.S. citizenship, the Court finds that both had an independent duty to make a probable cause determination. Collado had a duty to make an independent determination as to whether probable cause existed to continue to detain Lyttle before completing a notice of intent. *See* 8 C.F.R. §

1238.1(b)(1) (a notice of intent may be issued by an ICE officer "if the officer is satisfied that there is sufficient evidence, based upon questioning of the alien by an immigration officer and upon any other evidence obtained, to support a finding that the individual: (i) Is an alien"); *see also* 8 U.S.C. § 1357(a)-(b) (ICE officers have the power to interrogate "an alien or any person believed to be an alien," but only have the power to arrest an alien). The Court also finds that Moten had a duty to make an independent determination as to whether probable cause existed to continue to detain Lyttle. *See* 8 C.F.R. § 239.2(a) (an officer authorized to issue a notice to appear under may cancel the notice before jurisdiction vests with the immigration judge if the officer is satisfied the respondent is a U.S. citizen).

Any reasonable ICE officer in the same circumstances and possessing the same knowledge and information as Collado and Moten could not have reasonably believed that probable cause existed to detain Lyttle, continue his detention, or recommend him for removal for a violation of the immigration laws. Because their alleged conduct violated clearly established law, the Court rejects their qualified immunity defenses. *Fils*, 647 F.3d at 1292 (denying summary judgment based on qualified immunity to officers who should have known their conduct violated the plaintiff's Fourth Amendment rights). Accordingly,

Defendants Collado and Moten's motions to dismiss Lyttle's Fourth Amendment claims are denied.

Regarding Lyttle's Fifth Amendment claim, the Court reiterates that the case law of the Supreme Court and the Eleventh Circuit clearly established prior to the events giving rise to this action that an individual has a "right to be free from continued detention after it was or should have been known that the detainee was entitled to release," *Cannon*, 1 F.3d at 1563, and that deportation of a citizen is a deprivation of liberty implicating Fifth Amendment constitutional concerns, *Ng Fung Ho,* 259 U.S. at 284-85. The law was also clearly established that ICE officials do not have authority to arrest or detain a citizen. 8 U.S.C. §§ 1226, 1231, 1357 (granting ICE agents authority to arrest, detain, and deport *aliens*). Collado and Moten were on notice that their actions and deliberate indifference would violate Lyttle's due process rights. The Court finds that a reasonable officer in Collado or Moten's position "should have known that his conduct violated [Lyttle's] constitutional rights," and therefore they are not entitled to qualified immunity as to Lyttle's due process claims. *Fils,* 647 F.3d at 1287.

b.   DEFENDANT MONDRAGON

After the issuance of the Notice to Appear before the IJ, the Hayes Memo was issued. Compl. ¶ 63. Shortly after that

Memo was issued and prior to Lyttle's hearing before the IJ, ICE
Defendant Mondragon interrogated Lyttle.     Lyttle informed
Mondragon that he was a U.S. citizen.     Notwithstanding Lyttle's
clear statement of citizenship, Mondragon altered the record,
"creating a conflicting, inconsistent, and factually inaccurate
record."  *Id.*  ¶ 76.  He allegedly disregarded Lyttle's claim of
citizenship, independent evidence of citizenship, and Lyttle's
diminished mental capacity.     Mondragon further "coerced and
manipulated" Lyttle into signing and initialing an affidavit
that falsely affirmed that his name was "Jose Thomas" and that
his father was a citizen of Mexico with the same name.  Compl.
¶78.

Mondragon interrogated Lyttle on November 12, 2008, six
days after the issuance of the Hayes Memo.  For purposes of the
present motions, the Court accepts as alleged that Mondragon was
aware of the Hayes Memo and its directives at that time.  The
Memo purportedly sought to provide guidance on reporting and
investigating claims of U.S. citizenship.  The Memo directs that
prior to making a warrantless arrest of persons claiming U.S.
citizenship, an ICE officer "must ensure that s/he has reason to
believe that the individual to be arrested is in the United
States in violation of a law or regulation governing the
admission, exclusion or expulsion or removal of aliens."  Hayes
Memo 1.  In other words, probable cause must exist for the

warrantless detention.  *Id.* at 1 n.1.  The Memo further requires that all claims of U.S. citizenship shall be "fully investigate[d] . . . immediately upon learning of the assertion of citizenship."  *Id.* at 1.  Moreover, an officer "shall immediately notify the Field Office Director (FOD) through their chain of command" when they encounter an individual who the officer believes to be in the United States illegally but who claims to be a U.S. citizen.  *Id.*  The Memo requires that each Field Office Director "shall ensure that all affirmative claims to U.S. citizenship made by any individual encountered within their area of responsibility are appropriately reported and investigated."  *Id.* at 1-2.  When a detainee who claims U.S. citizenship is interviewed, the interrogating officer shall ask "probative questions designed to elicit information sufficient to allow an investigation of the person's claim of citizenship."  *Id.* at 2.  While the Memo does not set out all investigative methods and sources, it does by example include the following: "vital records searches, family interviews, and other appropriate investigative measures."  *Id.* at 2.

The Hayes Memo also makes it clear that an ICE officer must do more than simply record a claim of U.S. citizenship.  The Memo attempts to create safeguards, including reporting up the chain of command, throughout the investigation process to minimize the risk of deporting a U.S. citizen.  The Memo

provides that when an affirmative claim of citizenship is made before the commencement of removal proceedings, the Field Office Director shall, in consultation with Detention and Removal Operations headquarters and local Office Chief Counsel, determine whether "sufficient evidence exists to place that individual into removal proceedings." *Id.* The Memo further provides that if the claim of citizenship is made following the issuance of the Notice to Appear, each Office of Chief Counsel, in consultation with the Field Office Director who when necessary should consult with headquarters, "will determine the most appropriate course of action with respect to the disposition of the [Notice to Appear] and termination of the case, while also providing necessary advice to the [Field Office Director] as to changes in the individual's custody conditions." *Id.*

Under either method employed by the Eleventh Circuit in determining clearly established law, the Court finds that a reasonable officer in Mondragon's position under the circumstances should have known his conduct as alleged violated Lyttle's Fourth and Fifth Amendment rights. *See Fils*, 647 F.3d at 1291 (denying summary judgment based on qualified immunity to officers who should have known their conduct violated the plaintiff's Fourth Amendment rights).

Regarding Lyttle's Fourth Amendment claim, Mondragon lacked arguable probable cause to believe that Lyttle was an alien. The Court rejects Mondragon's argument that it was reasonable for him to rely on the previous determinations by the North Carolina ICE officers.  The procedure for deporting aliens provides for opportunities at various points during the process for continued detention to be reassessed.  *E.g.*, 8 C.F.R. § 239.2(a) (a Notice to Appear can be canceled if an officer authorized to issue such a notice is satisfied the detainee is a U.S. citizen).  An ICE officer must do more than blindly rubber-stamp the findings of a previous officer.  When an officer learns of information that suggests a detainee should not continue to be detained, particularly when evidence exists that the detainee is a U.S. citizen, then that officer has a duty to make an independent assessment as to whether he has a reasonable suspicion that the detainee is an alien.  Hayes Memo (stating that all officers "must fully investigate all claims to U.S. citizenship immediately upon learning of the assertion of citizenship"); *see also Brignoni-Ponce*, 422 U.S. at 881-82 (officers must have probable cause or consent to detain the individual).  Faced with Lyttle's claim of citizenship and corroborating independent evidence, a reasonable officer in Mondragon's position could not have believed that probable cause existed to detain Lyttle for violating the immigration laws.

Mondragon made no such meaningful assessment, and as mentioned, failed to follow the department policies for making such an evaluation. Mondragon's conduct, therefore, resulted in the continued unlawful detention of Lyttle in violation of his Fourth Amendment rights. That continued detention, without arguable probable cause, deprives Mondragon of his qualified immunity defense. *E.g., Cannon*, 1 F.3d at 144 (recognizing that due process includes the "right to be free from continued detention after it was or should have been known that the detainee was entitled to release").

Regarding Lyttle's Fifth Amendment claim, it would be clear to an ICE officer in Mondragon's position that deporting a U.S. citizen violates that citizen's constitutional rights. *See Hope v. Pelzer*, 536 U.S. 730, 739, 741 (2002) ("For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . in the light of pre-existing law the unlawfulness must be apparent. . .even in novel factual circumstances") (internal quotation marks omitted). As a trained ICE enforcement officer, Mondragon was on notice that the detention and deportation of a U.S. citizen violates that citizen's rights safeguarded by the Fifth Amendment and, thus, failing to take reasonable steps to avoid these unconstitutional actions would lead to a constitutional

violation.   *See supra* DISCUSSION I.B.1.a. (finding the same regarding Collado and Moten).

The Hayes Memo strengthens Lyttle's argument that Mondragon was aware that his conduct violated his constitutional rights. The issuance of the Hayes Memo should have heightened the awareness of a trained law enforcement officer, indicating to the officer that the Memo's requirements were intended to avoid wrongful deportations of U.S. citizens and that such deportations violated the most fundamental constitutional right that a citizen possesses—the right to remain free in his home country.   It is clear that the Memo applied to Mondragon's interrogation of Lyttle because Lyttle affirmatively claimed U.S. citizenship.  Hayes Memo 1.  Nevertheless, Mondragon failed to fully investigate Lyttle's claim: he failed to notify the Field Office Director that Lyttle claimed citizenship so that further investigation could be conducted and others in the chain of command could be consulted; and, he failed to ask probative questions designed to elicit information to allow an investigation of the claim.  *Id.* at 2.  Moreover, Lyttle alleges that Mondragon not only failed to act as required by the Hayes Memo, but he affirmatively took steps to expedite the unlawful removal by distorting the record and coercing Lyttle into signing an affidavit stating his name was "Jose Thomas" and his father was a citizen of Mexico.  Compl. ¶¶ 76-78.  Lyttle

alleges that because of this conduct, his removal proceeding was allowed to go forward, and he suffered continued unlawful detention and eventual expulsion from the United States. Mondragon's conduct, including his violation of the Memo's policies, demonstrates a deliberate indifference to Lyttle's constitutional rights. *See Cannon*, 1 F.3d at 1563 (deliberate indifference is required to establish a substantive due process violation).

The Court finds that Lyttle's allegations against Mondragon state a claim for a violation of Lyttle's Fourth and Fifth Amendment rights. The Court further finds that Mondragon had sufficient notice that his conduct violated Lyttle's constitutional rights. Thus, Mondragon is not entitled to qualified immunity. *See Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1284 (11th Cir. 1998) (stating that qualified immunity is overcome when "the conclusion for every like-situated reasonable government agent that what the defendant is doing violates federal law *in the circumstances*.") (internal quotation marks omitted).

Based on the foregoing, the Court denies Mondragon's motion to dismiss Lyttle's Fourth and Fifth Amendment claims.

c.   DEFENDANT SIMONSE

Defendant Simonse was the ICE Field Office Director responsible for enforcement of immigration laws in North

Carolina and Georgia, including the officers and detainees at SDC during the relevant time period.[14]   Simonse issued the final Warrant of Removal/Deportation after the IJ ordered Lyttle removed.   Compl. ¶ 93.   Prior to issuing that Warrant, Simonse conducted an additional database search on Lyttle.   That search, like others done by ICE, returned numerous references to Lyttle's U.S. citizenship and his Social Security number, corroborating Lyttle's earlier claims of citizenship.   *Id.* ¶ 92. Simonse disregarded this information, failed to consult with the Office of Detention and Removal Operations or the Office of Chief Counsel as required by the Hayes Memo, and issued the Warrant declaring that Lyttle was subject to removal/deportation based on the final order of the IJ.   *Id.* ¶¶ 92-93.   Pursuant to this Warrant, ICE took Lyttle to the Mexican border and banished him from the United States.   *Id.* ¶ 101.   Lyttle has sued Simonse in his individual and supervisory capacities.   *Id.* ¶ 14.

"It is well established in this circuit that supervisory officials are not liable under [*Bivens*] for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."   *Gonzalez*, 325 F.3d at 1234 (alteration in original) (internal quotation marks omitted).   Therefore, "a plaintiff must plead that each Government-official defendant,

_____

[14] Lyttle did not sue Simonse in his pending action in the Eastern District of North Carolina.   Am. Compl., *Lyttle v. United States*, No. 4:10-CV-142-D (E.D.N.C. Oct. 15, 2010), ECF No. 8.

through the official's own individual actions, has violated the Constitution." *Iqbal*, 129 S. Ct. at 1948.  Individual liability against a supervisor will lie in a *Bivens* action only when (1) "the supervisor personally participates in the alleged constitutional violation"; or (2) "there is a causal connection between the actions of the supervising official and the alleged constitutional violation." *Id.*

The Court finds that Simonse's failure to take any action upon learning of evidence that corroborated Lyttle's claim of U.S. citizenship and his subsequent issuance of the Warrant substantially contributed to and caused Lyttle's continued detention and deportation, resulting in a denial of Lyttle's Fourth and Fifth Amendment rights, as a U.S. citizen, not to be detained without probable cause and not to be banished from the United States.  A Field Office Director's job includes reviewing the custody of detainees.  *See* 8 C.F.R. § 241.4(a), (c), (h), (k) (establishing checks and reviews by the Field Office Director while immigration detainees are in custody during the removal process); 8 C.F.R. § 287.5 (d)-(e) & 8 C.F.R. § 236.1 (enumerating exercise of powers by immigration officers, including Field Office Directors' power to issue and execute warrants and notices of custody determination and conduct

searches).[15]   Simonse also had the authority to move to dismiss
Lyttle's removal proceedings on the grounds that Lyttle was a
U.S. citizen.   8 C.F.R. § 239.2(c).   The Court finds that as the
Field Office Director Simonse further had a duty to "ensure that
all affirmative claims to U.S. citizenship made by any
individual encountered within [his] area of responsibility
[were] appropriately reported and investigated."   Hayes Memo 1-
2.   A Field Office Director must consult with headquarters and
the local Office of Chief Counsel when affirmative claims of
U.S. citizenship are made (1) before removal proceedings
commence to determine if sufficient evidence exists to commence
proceedings, and (2) when a claim is made after the issuance of
a Notice to Appear to determine the appropriate course of
action.   *Id.* at 2.

Simonse's failure to take any action after Lyttle made
repeated claims of citizenship to ICE officers, including
Collado and Mondragon, and after finding evidence in the final
record search that corroborated Lyttle's claims of U.S.
citizenship substantially contributed to Lyttle's continued
detention and deportation in violation of his constitutional
rights.   The Court finds that a reasonable officer in Simonse's
position as a Field Office Director would know that failing to

---

[15]  The former INS district directors are now titled "Field Office
Directors," but their functions remain the same.   *See* 8 C.F.R. § 1.2.

do any follow up or consultation under these circumstances would be a denial of the constitutional rights of a U.S. citizen facing deportation. Simonse was further put on notice of these requirements by the Hayes Memo. Therefore, the Court finds that Simonse is not entitled to qualified immunity for Lyttle's Fourth and Fifth Amendment claims. *Fils*, 647 F.3d at 1291 (denying summary judgment based on qualified immunity to officers who should have known their conduct violated the plaintiff's Fourth Amendment rights).

Defendants also contend that Simonse is entitled to quasi-judicial immunity, claiming that he acted pursuant to the order of removal issued by the IJ. An immigration judge is protected by absolute immunity. *See Butz*, 438 U.S. at 514 (according absolute immunity to judges and officials of government agencies performing judge-like functions); *Alyshah v. Hunter*, No. 1:06-CV-0931-TWT, 2006 WL 2644910, at *4 (N.D. Ga. Sept. 13, 2006) (finding that immigration judge was entitled to absolute immunity for role in immigration proceeding). To qualify for absolute quasi-judicial immunity, an official must take an action within his or her authority that is integral to the judicial process. *Roland v. Phillips*, 19 F.3d 552, 555 (11th Cir. 1994). An "implementing officer is protected in executing the court's mandate." *Id.* at 556. The Court rejects Defendants' suggestion that Simonse was authorized to blindly

facilitate the IJ's decision.  He had an obligation, even after the IJ decision was made, to alert the appropriate persons with information demonstrating Lyttle's U.S. citizenship.  He was not merely tasked with implementing a court order, nor were his responsibilities or conduct sufficiently integral to the judicial process to cloak him with judicial immunity.  He had duties and responsibilities independent of the IJ, and he cannot hide behind quasi-judicial immunity when he failed to meet those responsibilities and facilitated the removal of a United States citizen.  *See* 8 C.F.R. §§ 236.1, 241.4(a), (c), (h), (k), 287.5 (d)-(e).  The Court finds that Simonse, therefore, is not protected by absolute quasi-judicial immunity.

The Court also finds that Lyttle has alleged a failure to train claim against Simonse as the Field Office Director. Construing all reasonable inferences in Lyttle's favor, the Court reads his Complaint as alleging that Simonse was aware of the substantial risk of wrongfully detaining and deporting U.S. citizens, and that as Field Office Director he had a responsibility to train his subordinates to take steps to minimize this risk.  Compl. ¶¶ 94-101.  Moreover, after the Hayes Memo was issued, he had the duty to ensure that his subordinates understood and adhered to the Memo's requirements that sought to enforce the clearly established rights of citizens in the immigration and removal context.  Hayes Memo 2.

According to the Complaint, Simonse did not fulfill these obligations. Therefore, the Court finds that Lyttle's allegations that Simonse knowingly failed to train his employees to minimize and avoid wrongful detentions and deportations properly alleges a violation of Lyttle's constitutional rights as a U.S. citizen under the Fourth Amendment not to be arrested and detained without probable cause and under the Fifth Amendment not to be deported or subject to continued detention without probable cause. *See Battiste v. Sheriff of Broward Cnty.*, 261 F. App'x 199, 201 (11th Cir. 2008) (per curiam) ("A supervisory official is liable under [*Bivens*] when his failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact and the failure has actually caused the injury of which the plaintiff complains.") (internal quotation marks omitted); *Rivas v. Freeman*, 940 F.2d 1491, 1495-96 (11th Cir. 1991) (finding that policymaker's "failure to adequately train . . . officers regarding reliable identification techniques" subjects a policymaker to liability). The Court further finds that a reasonable officer in Simonse's position would have been on notice that such failure to train under these circumstances would violate a U.S. citizen's constitutional rights. Therefore, the Court is satisfied that Lyttle's Complaint alleges that Simonse's failure to train violated a clearly

established right, and Simonse is not entitled to qualified immunity. *Cf. Battiste*, 261 F. App'x at 202-03 (stating that qualified immunity for failure to train is abrogated only where the officer has fair warning of clearly established law).

### d.  DEFENDANT HAYES

Hayes was the Director of the Office of Detention and Removal Operations during the time relevant to Lyttle's claims. Compl. ¶ 13.  Lyttle maintains that Hayes violated his constitutional rights by not adequately protecting U.S. citizens from wrongful deportation when he drafted the Hayes Memo, which Lyttle argues was entirely inadequate, and when he failed to adequately train his subordinates.

Lyttle alleges that the Memo provided "woefully insufficient" guidance to ICE officers regarding the proper investigation and handling of claims of U.S. citizenship. *Id.* ¶ 73.  The Court notes that Hayes can only be subject to individual liability arising from the creation of the Hayes Memo if his creation of that memo can be causally connected to the constitutional violation. *Gonzalez*, 325 F.3d at 1234.  The Court finds that Lyttle has not sufficiently alleged a causal connection between Hayes's preparation of his memo and the alleged violation of Lyttle's Fourth and Fifth Amendment rights. From Lyttle's allegations, it is not reasonable to conclude that Hayes was on notice that his Memo was so deficient that it would

lead to the wrongful detention and deportation of U.S. citizens, including Lyttle, in violation of their Fourth and Fifth Amendment rights. Accordingly, Hayes is entitled to qualified immunity as to Lyttle's claim involving the creation of the Hayes Memo. *See Dalrymple v. Reno*, 334 F.3d 991, 997 (11th Cir. 2003) (holding that the supervisory defendant is entitled to qualified immunity "because [plaintiffs] failed to allege facts that would establish a causal connection between [defendant's] supervisory actions and the alleged constitutional violations by the officers on the scene.").

The Court finds, however, that Lyttle has sufficiently alleged a failure to train claim. Hayes's Memo was aimed at addressing deficiencies in ICE investigations of U.S. citizenship claims, and Lyttle alleges that the Memo shows that Hayes clearly understood that there was an unacceptable risk within his department of detaining and deporting U.S. citizens if his subordinates did not employ adequate safeguards. Compl. ¶ 63. According to Lyttle's allegations, however, Hayes did not reasonably assure that the measures in his Memo, or ones similarly designed to safeguard a citizen detainee's constitutional rights, were implemented, as evidenced by the detention and deportation of Lyttle. Lyttle alleges that he was wrongfully detained and deported in large part because of this failure to train.

The Court finds that Hayes was on notice that detention of a U.S. citizen without probable cause and the removal of that citizen from the United States violated that individual's rights under the Fourth and Fifth Amendments.  The Court further finds that Lyttle has sufficiently alleged that Hayes understood that if measures similar to those outlined in his Memo were not followed that these wrongful detentions and removals would occur, and yet, according to Lyttle's complaint, Hayes failed to take reasonable steps to assure that his subordinates were adequately trained to take the necessary precautions designed to avoid the detention and removal of United States citizens. Lyttle has alleged a failure to train constitutional claim under the Fourth and Fifth Amendments, and Hayes is not entitled to qualified immunity on that claim.  *Battiste*, 261 F. App'x at 201-02; *Rivas*, 940 F.2d at 1495-96.

e.   DEFENDANTS JOHNSTON AND KEYS

After Lyttle returned to the United States, he was detained and interrogated by ICE enforcement officers Johnston and Keys, who had discovered from a routine database search that Lyttle was a previously deported alien with a criminal history.  Compl. ¶ 119.  Lyttle informed Johnston of his U.S. citizenship, his removal and his travels through Mexico and Central America.  He also showed the agents his U.S. passport and airline ticket, and had his adoption papers faxed to them showing his U.S.

citizenship.  *Id.*  ¶¶ 121-24.  Relying on the database search,
Johnston and Keys detained Lyttle and issued an expedited
removal order against him.  *Id.*  ¶ 125.  After two days of
detention, Lyttle was eventually released from custody because
of demands from an attorney retained by Lyttle's family.  *Id.*  ¶¶
127-28.

Johnston and Keys faced a difficult predicament.  They had
evidence presented to them by someone seeking to enter the
United States that he was a U.S. citizen with appropriate
documentation.  However, the official government record, which
they checked, demonstrated that this same person had been
lawfully deported.  At that time, they were not personally aware
of Lyttle's wrongful removal.  They simply knew that the
official government record listed him as an illegal and
previously deported alien.  Under these circumstances, the Court
cannot find that a reasonable officer under these circumstances
would have been on notice that their detention of Lyttle was a
clear violation of Lyttle's constitutional rights.  Accordingly,
Johnston and Keys are entitled to qualified immunity, and
Lyttle's claims against them in their individual capacity must
be dismissed.

### f.   DEFENDANT MOORE

Lyttle's Complaint contains no specific allegations about
Defendant Moore's conduct.  Lyttle argues that the Complaint

alleges facts about Moore in paragraphs 86 and 93, and that
Defendant Moore "could have been the ICE agent to have conducted
the additional investigatory searches into Mr. Lyttle's
citizenship that should have resulted in his release and
prevented his removal."  Pl.'s Resp. in Opp'n to the Individual
Federal Defs.' Mot. to Dismiss 2-3, ECF No. 57.  The Complaint,
however, contains no mention of Moore in those paragraphs or
evidence substantiating his conjectured involvement.  *See* Compl.
¶ 86 (stating facts about the IJ); *id.* ¶¶ 92-93 (stating facts
about ICE Field Office Director Raymond Simonse and an "ICE Doe
Defendant").  Moore is only identified in the Complaint as an
ICE agent sued in his individual capacity.  *Id.* ¶ 18.  The
Complaint contains no other mention of Moore and only conclusory
statements about the "ICE Defendants" generally.  *E.g.*, *id.* ¶
97.  The Court finds that Lyttle has failed to state a claim
against Moore, and therefore the Court grants Defendants' motion
to dismiss as to all claims against Defendant Moore.

2.   *Fifth Amendment Equal Protection Claim*

In addition to his Fourth Amendment unreasonable seizure
claim and his Fifth Amendment due process claim, Lyttle makes
broad and conclusory claims that the ICE Defendants
discriminated against him on the basis of his race and ethnicity
in violation of the Fifth Amendment.  "While a complaint
attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, . . . a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (second alteration in original) (citations omitted) (internal quotation marks omitted).  To this end, "a plaintiff must allege some factual detail as the basis" for a claim. *Keating*, 598 F.3d at 763.

Lyttle alleges that "[b]y illegally detaining [him] and/or causing his deportation to Mexico, ICE Defendants deliberately and unconstitutionally discriminated against [him] on the basis of his race and ethnicity so as to deny him equal protection of the law in violation of the Fifth Amendment." Compl. ¶ 138.  He alleges ICE Defendants acted in accordance with policies to "[s]elect inmates to detain, interrogate, and deport based on their race and/or ethnicity" and "habit" "to presume foreign citizenship of inmates based on their race, ethnicity, appearance, and/or surname." *Id.* ¶¶ 94-95.  Lyttle also alleges that the Defendants' failure to fully evaluate the records of his U.S. citizenship, "reflects a deliberate indifference by ICE . . . to the rights and well-being of inmates who are, or are perceived to be, racially/ethnically Latino." *Id.* ¶ 100.

Lyttle makes no specific allegations against any particular Defendant as to the role that race or ethnicity played in the

alleged misconduct towards Lyttle. Instead, Lyttle generally lumps all the ICE Defendants together and alleges in conclusory fashion that they discriminated against him because of his race and ethnicity. *Id*. ¶ 22, 138-42. Beyond these broad, conclusory statements, Lyttle has not alleged specific facts showing discriminatory intent or purpose on the part of any individual Defendant, even though discriminatory intent is a necessary element of any discrimination claim. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). The Supreme Court stated in *Iqbal* that a plaintiff's pleading that government officials subjected him to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin" and that government officials created, adopted, and executed this policy constituted "bare assertions" and amounted "to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." 129 S. Ct. at 1951 (alteration in original) (quoting *Twombly*, 550 U.S. at 555). The *Iqbal* court concluded these allegations were, thus, "conclusory and not entitled to be assumed true." *Id.*

Lyttle's allegations in support of his equal protection claim are nearly identical to those in *Iqbal* and, therefore, are conclusory. Moreover, they are not specific enough to overcome the qualified immunity defenses asserted by the individual

Defendants.  For all of these reasons, the Court finds Lyttle's conclusory allegations fail to state a claim of unconstitutional discrimination and grants ICE Defendants' motion to dismiss claim 2.

## II.  United States and Official Capacity Federal Defendants' Motion to Dismiss

The United States and the official capacity Defendants also filed a motion to dismiss.  U.S. & Official Capacity Defs.' Mot. to Dismiss & for Summ. J., ECF No. 47.  Defendants seek to dismiss claims 4 and 5 against them as jurisdictionally barred under Rule 12(b)(1).  The United States moves to dismiss claims 6, 7, and 9 against it on the same grounds and alternatively under Rule 12(b)(6).

### A.   Claims 4 and 5: Rehabilitation Act and Due Process

In claim 4, Lyttle seeks monetary damages and injunctive relief for the Defendants' alleged violations of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  In claim 5, Lyttle seeks injunctive relief to prevent future violations of his Fifth Amendment rights.  Defendants move to dismiss these claims under Rule 12(b)(1).

#### 1.  *Sovereign Immunity as a Bar to Monetary Damages*

Defendants contend they are entitled to sovereign immunity as to claims under § 504 of the Rehabilitation Act, insofar as

Lyttle seeks monetary damages.[16]   Lyttle agrees that his claim for damages under § 504 of the Rehabilitation Act is precluded by sovereign immunity, and he withdrew that claim to the extent it seeks damages.   Pl.'s Resp. in Opp'n to U.S. & Official Capacity Defs.' Mot. to Dismiss & for Summ. J. 4-5, ECF No. 56. The Court finds this claim properly dismissed for lack of subject matter jurisdiction.[17]   *See Lane v. Pena*, 518 U.S. 187, 192 (1996) ("The clarity of expression necessary to establish a waiver of the Government's sovereign immunity against monetary damages for violations of § 504 [of the Rehabilitation Act] is lacking in the text of the relevant provisions.").

### 2.   *Standing to Seek Injunctive Relief*

Defendants also argue that the Court has no subject matter jurisdiction over claims 4 and 5 because Lyttle lacks standing insofar as he seeks injunctive relief.   As to claim 4, Lyttle seeks injunctive relief to avoid further injury caused by the lack of procedural safeguards for people with mental disabilities in the detention, immigration court, and

---

[16]  Defendants also sought to dismiss Lyttle's Fifth Amendment due process claim, claim 5, on this ground.   Lyttle, however, did not seek monetary damages in that claim.

[17]  Although the Complaint states that Defendant Hayes "is sued in his supervisory and individual capacity," Compl. ¶ 13, it appears that claim 4 is asserted against Hayes in his *official* capacity.   *See* Compl. ¶ 153.   Moreover, § 504 of the Rehabilitation Act does not provide for individual capacity suits against government officials. *E.g., Miller v. King*, 384 F.3d 1248, 1277 (11th Cir. 2004), *vacated on other grounds in* 449 F.3d 1149 (2006).   For the same reasons the Court dismisses this claim as to the official capacity defendants, the Court dismisses the claim as to Hayes.

deportation systems in violation of the Rehabilitation Act.
Compl. ¶ 165.  In claim 5, Lyttle seeks injunctive relief that
would require verification of a detainee's citizenship to
prevent Lyttle from again being erroneously identified as a non-
citizen and deported.  *Id.* ¶¶ 168-71.

The plaintiff bears the burden of establishing the
constitutional requirements of standing: (1) the plaintiff
suffered an injury; (2) the injury is causally connected to the
conduct complained of; and (3) the injury will be redressed by a
favorable decision.  *Elend v. Basham*, 471 F.3d 1199, 1206 (11th
Cir. 2006).  As to the first requirement for injunctive relief,
a plaintiff must "allege, and ultimately prove[], a real and
immediate—as opposed to a merely conjectural or hypothetical—
threat of *future* injury."  *Church v. City of Huntsville*, 30 F.3d
1332, 1337 (11th Cir. 1994).  "Logically, a prospective remedy
will provide no relief for an injury that is, and likely will
remain, entirely in the past."  *Id.* (internal quotation marks
omitted).

Defendants contend that Lyttle lacks standing to seek
injunctive relief because he has not satisfied the first
requirement.  Defendants argue Lyttle has not alleged a "real
and immediate threat" of repeated injury.  *City of Los Angeles
v. Lyons*, 461 U.S. 95, 105 (1983).  Specifically, Defendants
contend that Lyttle has not shown a real threat of "being

interviewed by ICE, misidentified as a non-citizen, placed in removal proceedings, and ordered removed." Mem. in Supp. of U.S.' & Official Capacity Defs.' Mot. to Dismiss & for Summ. J. 14, ECF No. 47-1 [hereinafter U.S. Mem.]. Further, Defendants argue that this injury is unlikely to repeat itself because the Department of Homeland Security has recognized Lyttle as a citizen and the IJ terminated Lyttle's removal proceedings with prejudice. *Id.*

Lyttle nevertheless claims that he "has suffered and is likely to again suffer irreparable injury, and is entitled to injunctive relief to avoid further injury." Compl. ¶¶ 165 & 171. The key inquiry at this stage is whether Lyttle has "shown a real and immediate threat of future harm." *Elend*, 471 F.3d at 1207. "The binding precedent in this circuit is clear that for an injury to suffice for prospective relief, it must be imminent." *Id.* In other words, it must be plausible that the threatened injury will "proceed with a high degree of immediacy." *31 Foster Children v. Bush*, 329 F.3d 1255, 1266-67 (11th Cir. 2003). The mere chance of an injury occurring is not enough to establish standing. *Bowen v. First Family Fin. Servs.*, 233 F.3d 1331, 1340 (11th Cir. 2000). Standing requirements must be pleaded with a "fair degree of specificity." *Steele v. Nat'l Firearms Act Branch,* 755 F.2d 1410, 1414 (11th Cir. 1985).

Under these standards, Lyttle's allegations are insufficient. Lyttle has failed to show a substantial likelihood or a "realistic danger" of future injury. He has not alleged when, if ever, the injuries he seeks to prevent may occur. In *Lyons*, the Supreme Court noted that the plaintiff would have to make a series of "incredible assertions" to have standing on his claim for injunctive relief—including allegations that he would be stopped for a traffic violation and would be subjected to a chokehold without any provocation. *Lyons*, 461 U.S. 107-08. Just as in *Lyons*, "a sequence of individually improbable events would have to occur" for Lyttle to sustain a future injury similar to that which he allegedly suffered at the hands of the Defendants. *See Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1162 (11th Cir. 2008) (analyzing the denial of standing in *Lyons*). Here, (1) Lyttle would have to do something to cause a run-in with immigration officials, (2) ICE would have to have authorized all immigration officials to ignore citizenship records, (3) ICE agents would have to ignore records of Lyttle's citizenship and declare him an alien, and (4) Lyttle would have to be ordered removed. This unlikely combination of future events is merely speculative and does not satisfy the injury in fact requirement of standing. *Lyons*, 461 U.S. at 107-08.

Lyttle asserts his case is different than *Lyons* because he was targeted based on his mental disabilities. Significantly, however, Lyttle still fails to show that any injury is likely or imminent. The Court also rejects Lyttle's argument that the fact that he was already harmed twice—first by being detained and deported and second by the threat of deportation upon returning to the United States—establishes standing. Lyttle relies on the Ninth Circuit's statement that "[t]he possibility of recurring injury ceases to be speculative when actual repeated incidents are documented." *Nicacio v. United States*, 797 F.2d 700, 702 (9th Cir. 1985), *overruled by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) (en banc) (finding that injury to unnamed class members was "irrelevant to the question whether the named plaintiffs" were entitled to injunctive relief). The Eleventh Circuit does not find past repetition controlling in a standing inquiry, but rather focuses on future imminent harm as discussed above. *31 Foster Children*, 329 F.3d at 1266.

Moreover, the termination of Lyttle's removal proceedings makes it exceptionally tenuous that Lyttle could again be detained, declared an alien, and deported. After Lyttle made his way back to the United States, the Department of Homeland Security moved to terminate the removal proceedings against Lyttle based on the fact that he is a U.S. citizen. DHS Mot. 2.

77

In response, the IJ ordered Lyttle's removal proceedings terminated with prejudice. U.S. Mem. Ex. J, Order of Immigration Judge, Apr. 28, 2009, ECF No. 47-3 at 26.

For the forgoing reasons, Lyttle has not alleged an imminent future injury. "If the plaintiff fails to meet its burden, this court lacks the power to create jurisdiction by embellishing a deficient allegation of injury." *Elend*, 471 F.3d at 1206. Accordingly, the Court finds Lyttle lacks standing to seek injunctive relief, and grants Defendants' motion to dismiss claims 4 and 5.

   B.   Lyttle's Tort Claims

Lyttle also asserts claims against the United States under the FTCA based on the acts of the ICE Defendants. The FTCA provides a limited waiver of immunity "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1); *accord Sheridan v. United States*, 487 U.S. 392, 400-01 (1988). The FTCA permits claims against the United States "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Lyttle's FTCA claims are based upon the torts of false imprisonment, negligence, and intentional

infliction of emotional distress.   The Court examines each claim separately.

    *1.   False Imprisonment*

    In claim 6, Lyttle asserts a claim for false imprisonment against the United States based on the ICE Defendants' apprehension, detention, and deportation of Lyttle without consent, probable cause, or legal authority.   The United States argues it is entitled to sovereign immunity on this claim under the "due care exception" to FTCA liability.   Under the due care exception, the FTCA does not apply to "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid."   28 U.S.C. § 2680(a). In asserting this exception, the United States ignores the plain meaning of another statutory provision that applies directly to Lyttle's false imprisonment claim.   That provision makes clear that sovereign immunity will not apply "with regard to acts or omissions of investigative or law enforcement officers of the United States Government, . . . to any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution."   28 U.S.C. § 2680(h).   The Eleventh Circuit adheres to the "plain meaning and clear purpose of [§ 2680(h)]," concluding "if a claim is one of those listed in the proviso to subsection (h) . . . sovereign immunity is

waived." *Nguyen v. United States*, 556 F.3d 1244, 1256-57 (11th Cir. 2009).

ICE agents are "empowered by law to execute searches, to seize evidence, [and] make arrests for violations of Federal law." *Id.* at 1252; *see* 8 U.S.C. § 1357(a)-(c) (enumerating immigration officer's powers). Therefore, the Court finds they are law enforcement officers as contemplated by § 2680(h), and accordingly Lyttle's false imprisonment claim is not subject to § 2680(a)'s due care exception to the waiver of sovereign immunity. Having found jurisdiction to consider Lyttle's false imprisonment FTCA claim, the Court must next determine whether Lyttle's allegations state a claim for false imprisonment under Georgia law. *See Ochran v. United States*, 273 F.3d 1315, 1317 (11th Cir. 2001) (finding that FTCA claims are governed by the law of the state where the alleged tortious activity occurred).

Under Georgia law, "[f]alse imprisonment is the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty." O.C.G.A. § 51-7-20. The tort of false imprisonment has two essential elements: a detention and the detention's unlawfulness. *Ferrell v. Mikula*, 295 Ga. App. 326, 329, 672 S.E.2d 7, 10 (2008).

Lyttle alleges that he was unlawfully detained when he was: (1) taken into custody by the ICE Defendants in Georgia; (2)

detained by the ICE Defendants in Georgia while they were in the process of removing him from the United States; (3) expelled from the United States and prevented from returning; and (4) detained upon his reentry to the United States.  Compl. ¶¶ 56-58, 119-25, 173.  Lyttle has sufficiently alleged that he was detained, thus, satisfying the first element of his false imprisonment claim.  The United States argues that Lyttle cannot satisfy the second element of his claim, unlawfulness of the detention, because he was detained by "valid legal process." Lyttle responds that he was not detained pursuant to valid legal process because the ICE Defendants had no authority to detain a U.S. citizen, particularly when they had readily available evidence indicating that they had no reasonable basis or probable cause to suspect he was an alien.

The Court has exhaustively described the factual allegations in Lyttle's Complaint supporting his contention that the ICE Defendants unlawfully detained him without probable cause.  *See supra* DISCUSSION I.B.1.  Those factual allegations sufficiently satisfy the second element of Lyttle's false imprisonment claim, the unlawfulness of his detention.  *See Redd*, 140 F.3d at 1382 (to be lawful, detention that is more than a mere investigatory stop or an arrest must be supported by probable cause); *Williams v. Smith*, 179 Ga. App. 712, 714, 348 S.E.2d 50, 52 (1986) ("[W]here a person is unlawfully detained

under a void process, or under no process at all, false imprisonment *is* an available remedy . . . [if] the detention without supporting process was [not] legally authorized under the circumstances."). Even if the initial detention order and warrant issued by North Carolina ICE was facially valid, the subsequent detention documents issued by the ICE Defendants in Georgia lacked probable cause. Lyttle alleges that the ICE Defendants failed to evaluate the clear evidence presented to them that Lyttle was a U.S. citizen. Further, their continued detention of Lyttle in the absence of probable cause or a reasonable belief that he was an alien showed a conscious indifference to his legitimate claims of citizenship. *See Cannon*, 1 F.3d at 1563 (recognizing a "constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release"); *Downey v. Wilkins*, 467 F.2d 1022, 1025 (5th Cir. 1972) (concluding that "mere good intentions which do not give rise to a reasonable belief that detention is lawfully required cannot justify false imprisonment"). For all of these reasons, the Court finds that the United States' motion to dismiss Lyttle's false imprisonment FTCA claim must be denied.

> 2.  *Negligence  and  Intentional  Infliction  of
> Emotional Distress Claims*

Lyttle  also  asserts  claims  of  negligence  and  intentional
infliction  of  emotional  distress.    Before  determining  whether
Lyttle  has  adequately  alleged  the  essential  elements  of  these
two  separate  torts  under  Georgia  law,  the  Court  must  first
address  Defendants'  contention  that  the  Court  lacks  jurisdiction
to  consider  these  claims  because  the  discretionary  function
and/or  due  care  exceptions  to  the  FTCA  waiver  of  immunity  apply
here.

### a.  DISCRETIONARY FUNCTION EXCEPTION

For  these  two  types  of  torts,  the  FTCA  does  not  waive
sovereign  immunity  if  the  claims  are  "based  upon  the  exercise  or
performance  or  the  failure  to  exercise  or  perform  a
discretionary  function  or  duty  on  the  part  of  a  federal  agency
or  an  employee  of  the  Government,  whether  or  not  the  discretion
involved  be  abused."    28  U.S.C.  §  2680(a).    To  determine  whether
this  discretionary  function  exception  to  the  FTCA  waiver  of
immunity  bars  suit  against  the  United  States,  the  courts
generally  decide:  (1)  "whether  the  challenged  act  or  omission
violated  a  mandatory  regulation  or  policy  that  allowed  no
judgment  or  choice;"  and  (2)  whether  the  conduct  is  grounded  in
"developing  or  carrying  out  public  policy."    *Autery v. United
States*,  992  F.2d  1523,  1526-27  (11th  Cir.  1993).    If,  however,  a

"federal statute, regulation, or policy specifically prescribes a course of action, embodying a fixed or readily ascertainable standard," then the government employee's conduct is not within the exception.  *Id.* at 1529; *accord Ala. Elec. Coop, Inc. v. United States*, 769 F.2d 1523, 1529 (11th Cir. 1985).

The Court finds that taking the facts in the light most favorable to Lyttle as it must at this stage of litigation, Lyttle has sufficiently alleged that during the time the ICE Defendants detained Lyttle prior to his deportation, certain policies specifically prescribed a course of action.  These allegations take the ICE Defendants' conduct outside of the discretionary function exception.  *See Autery,* 992 F.2d at 1529 ("[i]f a federal statute, regulation, or policy specifically prescribes a course of action, embodying a *fixed or readily ascertainable standard* . . . a government employee's conduct [will] not fall within the discretionary function exception.") (citations omitted) (internal quotation marks omitted). Specifically, Lyttle points to the INA and the Hayes Memo. Although Lyttle alleges alternatively that the Memo was deficient in adequately protecting his rights, Lyttle points to the Memo's mandatory requirements with which one or more of the ICE Defendants was required to comply.  *See supra* DISCUSSION I.B.1.b. (discussing Hayes Memo).  The Court rejects the United States' narrow characterization of the Memo's requirements as

being limited to broad general suggestions regarding interrogation and investigative techniques. As previously explained, the Hayes Memo requires certain specific acts and reporting up the chain of command by ICE officers. *See supra* DISCUSSION I.B.1.b. The Court finds that Lyttle has adequately pled sufficient facts to avoid the discretionary function bar to the United States' FTCA liability.

### b.   DUE CARE EXCEPTION

The United States also contends that the due care exception to FTCA liability bars Lyttle's negligence and intentional infliction of emotional distress claims. A two-part inquiry is used to determine whether the due care exception applies. *Welch v. United States*, 409 F.3d 646, 652 (4th Cir. 2005) (citing *Crumpton v. Stone,* 59 F.3d 1400, 1403 (D.C. Cir. 1995)). "First, we determine whether the statute or regulation in question specifically proscribes a course of action for an officer to follow." *Id.* "Second, if a specific action is mandated, we inquire as to whether the officer exercised due care in following the dictates of that statute or regulation." *Id.* Sovereign immunity is not waived if due care is exercised. *Id.*

Lyttle contends that the due care exception does not apply because the ICE Defendants carried out their responsibilities under the pertinent statutes and regulations inappropriately,

without due care.  The United States argues that once Lyttle was transferred to ICE Defendants as a deportable alien, as determined by North Carolina ICE officials, his detention and deportation were mandatory and carried out with due care.

The Court finds that under the circumstances alleged here, Lyttle's continued detention and ultimate deportation were not mandatory or carried out with due care.  As previously explained in the context of Lyttle's *Bivens* claims, the ICE Defendants were required to take certain actions when Lyttle made a claim of U.S. citizenship.  Instead of taking those mandatory actions, Lyttle alleges that the ICE Defendants did nothing.  The ICE Defendants simply rubber-stamped the removal paper work initiated by North Carolina ICE officers notwithstanding Lyttle's claim of citizenship and available corroborating evidence.  Moreover, they allegedly coerced him into making inconsistent statements, taking advantage of his known mental deficiencies.  Their actions resulted in a distorted and false record and facilitated the continued detention and eventual deportation of a U.S. citizen.  The Court finds that at this stage of the litigation, Lyttle has sufficiently alleged enough to overcome the due care exception to FTCA liability.

c.  SUBSTANTIVE   CLAIMS   OF   NEGLIGENCE   AND
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The United States maintains that even if the discretionary function and due care exceptions do not bar its FTCA liability, Lyttle has not sufficiently alleged the essential elements for the torts of intentional infliction of emotional distress and negligence under Georgia law. *See* 28 U.S.C. § 2674 (imposing tort liability on the United States under "the law of the place where the act or omission complained of occurred . . . in the same manner and to the same extent as a private individual under like circumstances"). The Court will evaluate each claim in turn.

To sustain a claim of intentional infliction of emotional distress under Georgia law, a plaintiff must plead the following four elements: (1) the conduct giving rise to the claim was intentional or reckless; (2) the conduct was "extreme and outrageous"; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. *Miraliakbari v. Pennicooke*, 254 Ga. App. 156, 157, 561 S.E.2d 483, 486 (2002). The United States asserts that Lyttle failed to sufficiently plead the second element because "Lyttle has not come close to pleading conduct that is sufficiently extreme and outrageous." U.S. Mem. 32. To meet this element, conduct must be "so extreme as to go beyond all reasonable bounds of decency, and to be regarded as

87

atrocious, and utterly intolerable in a civilized community." *Miraliakbari*, 254 Ga. App. at 160, 561 S.E.2d at 488 (internal quotation marks omitted). The ICE Defendants' conduct, as pled by Lyttle, meets this standard: ICE Defendants unlawfully detained a mentally impaired U.S. citizen without any reasonable basis for concluding that he was not a citizen; deprived him of his liberty by continuing to detain him after he claimed U.S. citizenship; refused to investigate and follow reporting policies when he claimed U.S. citizenship; removed and deported him from the United States despite clear evidence of his citizenship forcing him to wander around Central America for months with no way to support himself; and then detained him again upon his return to the United States after his family thought they had finally cleared up any confusion as to his citizenship status. *Cf. K-Mart Corp. v. Lovett*, 241 Ga. App. 26, 29, 525 S.E.2d 751, 755 (1999) (finding conduct sufficiently outrageous where defendants falsely stated plaintiff had shoplifted and knew plaintiff would be jailed and did not take any steps to end the incarceration for twenty-four days despite knowing plaintiff was innocent), *abrogated on other grounds in Golden Peanut Co. v. Bass*, 249 Ga. App. 224, 233-34, 547 S.E.2d 637, 646 (2001) (en banc). The Court finds that the ICE Defendants' alleged conduct was sufficiently extreme or outrageous to amount to intentional infliction of emotional

distress such that "an average member of the community would
. . . exclaim, 'Outrageous!'" *Turnage v. Kasper*, 307 Ga. App.
172, 182, 704 S.E.2d 842, 852 (2010) (internal quotation marks
omitted).

The United States also contends that Lyttle failed to
assert a claim of negligence because Georgia law lacks a common
law analog to the negligent enforcement of U.S. immigration
laws. In other words, a private person would not be liable in
like circumstances under Georgia law. Defendants read the FTCA
too narrowly. The Supreme Court has made it clear that the
statutory phrase "like circumstances" does not restrict a
court's inquiry to the *same* circumstances, but rather courts
must look to analogous relationships and duties under state tort
law. *United States v. Olson*, 546 U.S. 43, 46-47 (2005); *see
also Pate v. Oakwood Mobile Homes, Inc.*, 374 F.3d 1081, 1084
(11th Cir. 2004) (noting that the "comparison of activities need
not be exact.") (internal quotation marks omitted). Under
Georgia law, the elements of a negligence claim are "the
existence of a duty on the part of the defendant, a breach of
that duty, causation of the alleged injury, and damages
resulting from the alleged breach of the duty." *Rasnick v.
Krishna Hospitality, Inc.*, 289 Ga. 565, 566, 713 S.E.2d 835, 837
(2011). Lyttle asserts that "ICE Defendants breached their duty
of reasonable care by negligently acting or failing to act in

such a way that resulted in Mr. Lyttle's wrongful detention and deportation by ICE, which these Defendants knew or should have known posed a substantial risk of grave harm to Mr. Lyttle." Compl. ¶ 179.   Lyttle alleges specifically that the Defendants were negligent in performing their duties by: failing to review available documentation of Lyttle's citizenship; failing to investigate Lyttle's claims of being born in the United States; coercing and manipulating him into signing a Notice of Rights form without assisting him in understanding his rights, reading the form, or protecting him from coercion despite his mental disabilities; failing to adequately train and supervise ICE officers; and detaining, holding, and deporting a U.S. citizen. *Id.* ¶ 180.

The Court finds that these allegations would support a general negligence claim for arrest and confinement under Georgia law. *See, e.g.*, *Corp. Prop. Investors v. Milon*, 249 Ga. App. 699, 705, 549 S.E.2d 157, 163 (2001).   They also support an analogous negligent infliction of emotional distress claim. *See, e.g.*, *Clarke v. Freeman*, 302 Ga. App. 831, 836, 692 S.E.2d 80, 84-85 (2010) (recognizing negligent infliction of emotional distress claim even with no "impact" if conduct is willful or wanton).   Lyttle has adequately pled a claim for negligence for purposes of FTCA liability.

Having found no jurisdictional bar to the Court's consideration of Lyttle's claims and finding that the allegations state viable claims under Georgia law, the Court finds that the United States' motion to dismiss Lyttle's negligence and intentional infliction of emotional distress claims under the FTCA must be denied.[18]

CONCLUSION

Defendants' motions to dismiss (ECF Nos. 47 & 49) are granted in part and denied in part. Specifically, the Court dismisses the following claims: (1) the official capacity claims against Defendants James Hayes, Eric Holder, John Morton, Janet Napolitano, and Thomas Snow; (2) the individual capacity *Bivens* equal protection claims as to all Defendants against whom they are asserted; (3) the individual capacity *Bivens* Fifth Amendment due process claims against Defendants Johnston, Keys, and Moore; and (4) the individual capacity *Bivens* Fourth Amendment

---

[18] The United States argues that if the Court does not dismiss Lyttle's FTCA claims, it should find that recovery for any surviving FTCA claim is limited to the injuries Lyttle suffered in the United States based on the FTCA foreign country exception, 28 U.S.C. § 2680(k). This exception preserves sovereign immunity for any harm that arises solely outside the United States and, thus, bars "'all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred.'" *Gil-Perenguez v. United States,* 449 F. App'x 781, 783 (11th Cir. 2011) (per curiam) (quoting *Sosa v. Alvarez-Machin*, 542 U.S. 692, 712 (2004)). The Court reserves for trial the issue of whether Lyttle's damages for continuing harm that originated in the United States are recoverable.

unreasonable seizure claims against Johnston, Keys, and Moore.[19] The following claims remain pending: (1) the *Bivens* Fifth Amendment due process claims against Defendants Collado, Moten, Mondragon, Simonse, and Hayes; (2) the *Bivens* Fourth Amendment unreasonable seizure claims against Defendants Collado, Moten, Mondragon, Simonse, and Hayes; and (3) the Federal Tort Claims Act claims against the United States for false imprisonment, negligence, and intentional infliction of emotional distress.[20] Plaintiff's Motion for Leave to Correct Formatting Error (ECF No. 62) is unopposed and moot after issuance of this Order.

Within 21 days of this Order, the parties shall submit a joint proposed scheduling order setting out a proposed schedule for the management of this action given today's rulings. The proposed scheduling order shall include a schedule for Defendants to re-file their summary judgment motion as to claim 8. In light of this ruling, Lyttle's Motion for Leave to File Response Out of Time (ECF No. 61) is moot.

---

[19] Accordingly, no claims remain against Defendants Johnston, Keys and Moore.

[20] The following claims, which were not included in the Defendants' motions to dismiss, also remain pending: (1) Plaintiff's FTCA negligence claim against the United States related to medical care Plaintiff received while detained; (2) Plaintiff's 42 U.S.C. § 1983 claims against Georgia Does 1-10; and (3) Plaintiff's Georgia False Arrest, False Imprisonment, Negligence, Intentional Infliction of Emotional Distress claims against Georgia Does 1-10.

IT IS SO ORDERED, this 31st day of March, 2012.

                              S/Clay D. Land
                            _____
                                  CLAY D. LAND
                            UNITED STATES DISTRICT JUDGE